In re PAN AM CORPORATION, et al., Debtors.

PAN AM CORPORATION, et al., Appellees/Plaintiffs,

v.

DELTA AIR LINES, INC., Defendant and Counterclaim Plaintiff,

v.

The OFFICIAL COMMITTEE OF UNSE-CURED CREDITORS OF PAN AM CORPORATION, et al., Appellees/Counterclaim Defendants.

Standard & Poor's Corporation, Appellant/Non–Party.

Bankruptcy Nos. 91 B 10080, 91 B 10087(CB).
Adv. No. 91–6626A(CB).
Appeal Nos. 93 Civ. 6169, 93–Civ. 6170 (LAP).

United States District Court, S.D. New York.

Dec. 7, 1993.

not reach this issue, however, since we agree    with Child World on the merits.

James L. Bromley and George Weisz, Cleary Gottlieb Steen & Hamilton, New York City, for Pan Am Corp.

Victor A. Kovner, Lankenau Kovner & Bickford, New York City, for Standard & Poor's Corp.

Lawrence M. Handelsman, Stroock & Stroock & Lavan and Dennis E. Glazer, Davis Polk & Wardwell, New York City, for Delta Air Lines, Inc.

Robert J. Lanza, Marcus Montgomery Wolfson & Burten, P.C., New York City, for The Official Committee of Unsecured Creditors of Pan Am Corp.

## OPINION AND ORDER

PRESKA, District Judge:

This is an appeal by Standard & Poor's Ratings Group ("S & P") from two orders of the Bankruptcy Court for the Southern District of New York. The first order, issued on July 15, 1993, denied S & P's motion to quash a subpoena *duces tecum* issued by appellee Pan Am Corporation, *et al.* and the Official Committee of Unsecured Creditors ("Pan Am"). The second order, issued on August 10, 1993, held S & P in civil contempt for failing to comply with the subpoena *duces tecum*. For the reasons set out below, both of those orders are reversed.

## BACKGROUND

This appeal arises out of an adversary proceeding in the bankruptcy of Pan Am, *Pan Am v. Delta Airlines, Inc.*, Adv. Proc. No. 91–6626A (CB) (Bankr.S.D.N.Y.). Plaintiffs' complaint in the adversary proceeding alleges that, as a result of Delta Airlines, Inc.'s ("Delta") repudiation of a commitment to fund Pan Am's reorganization, Pan Am was left with no choice but to abandon reorganization efforts and cease all flight operations.

In August, 1992, Pan Am served a subpoena *duces tecum* upon S & P seeking documents relating to meetings, correspondence and other communications between S & P and Delta, which occurred after January 1, 1991. Pan Am alleges that Delta's decision not to go forward with its plan to participate in Pan Am's reorganization was precipitated, at least in part, by discussions between S & P and Delta representatives.

S & P assesses, rates, and comments on the creditworthiness of domestic and international corporate and governmental debt instruments. It publishes its ratings and other financial information in periodicals like *CreditWeek, High Yield Quarterly,* and *Ratings Handbook.* S & P is not alleged to have engaged in any wrongdoing in the present case.

S & P responded to the subpoena by asserting a journalist's qualified privilege against production and refused to comply. The parties attempted without success to resolve the dispute, and on May 27, 1993, Bankruptcy Judge Blackshear granted S & P's request that it be permitted to move to quash the subpoena. After a full round of briefing, the Bankruptcy Court held a hearing on June 29, 1993.

At the conclusion of the hearing, Judge Blackshear ruled that S & P had failed to establish that it was entitled to assert the journalist's privilege, and, further, that even if S & P were allowed to assert the privilege, Pan Am had demonstrated sufficient need for the subpoenaed material to overcome it. Shortly after the hearing, Judge Blackshear signed an order submitted by Pan Am (the "July 15 Order") setting forth the Court's findings of fact and conclusions of law and requiring S & P to produce documents within ten days.

On July 20, 1993, S & P moved by order to show cause in the District Court seeking a stay and expedited appeal of the July 15 Order. In an order issued July 28, 1993, Judge Wood, sitting in Part I, denied the motion on the grounds that the July 15 Order was interlocutory and could not be appealed in the absence of an adjudication of contempt.

Following another conference before Judge Blackshear at which S & P declared its intent to refuse to comply with the July 15 Order, Pan Am moved the Bankruptcy Court for an adjudication of contempt against S & P. After a hearing on August 5, 1993, Judge Blackshear entered a contempt order and imposed a $1,000 per day fine, commencing August 9, 1993, for each day that S & P remained in violation of the July 15 Order.

Subsequently, S & P again moved in the District Court for a stay of the contempt order. The parties appeared for a hearing before this Court in Part I on August 19, 1993. At the conclusion of the hearing, the Court granted S & P's motion for a stay pending the resolution of this appeal. The case was thereafter assigned by lot to this Court for all purposes pursuant to Rule 1 of the Rules for the Division of Business Among District Court Judges.

## DISCUSSION

### I. Standards of Review

The parties agree that the findings of fact and conclusions of law in support of the Bankruptcy Court's August 5, 1990 contempt order, as well as the Bankruptcy Court's conclusions of law in support of the July 15, 1993 Order, are reviewed *de novo* on appeal. *See* Fed.R.Bankr.P. 9020 and 9033. Thus, the only issue with respect to the standard of review concerns the findings of fact supporting the Bankruptcy Court's July 15, 1993 Order.

Arguing from Fed.R.Bankr.P. 8013, Pan Am contends that the findings of fact in the July 15 Order must be reviewed under a "clearly erroneous" standard. S & P argues

for a departure from the rule on several theories. None of those theories need be considered, however, because the Court finds the result to be the same under any of the standards of review urged. Without deciding the issue, the Court elects to review the findings of fact in the July 15, 1993 Order under the more deferential "clearly erroneous" standard.[1]

## II. The July 15 Order

In its July 15 Order denying S & P's motion to quash the subpoena *duces tecum*, the Bankruptcy Court acknowledged that in some circumstances, the law of this Circuit affords journalists a qualified First Amendment privilege against discovery. The Bankruptcy Court held, however, that S & P was not entitled to assert that privilege. Specifically, the Bankruptcy Court held that (1) as a matter of fact, S & P did not gather the sought-after information with the journalistic intent required to claim the privilege; (2) as a matter of law, S & P's publications were not entitled to special First Amendment protection; and (3) as a matter of fact, even if S & P had properly invoked the privilege, Pan Am had demonstrated sufficient need to overcome it. The Court will examine each of these findings in turn.

### A. S & P's Intent

The seminal case in the Second Circuit on the journalist's privilege is *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). The Court of Appeals determined that in some cases, the public's interest in a free and active press outweighs its interest in the compelled disclosure of information held by journalists. In those instances, the Court of Appeals held, a journalist is to be afforded a privilege against compelled disclosure.

■ Recognizing the general principle that evidentiary privileges must be limited to the greatest extent possible, the *von Bulow* court made clear that one wishing to invoke the journalist's privilege has the affirmative burden of demonstrating that he or she is within the class of persons for whom the privilege is needed to protect against infringement of freedom of the press and the public's need to be informed. In particular, the Court of Appeals held that:

> "... individual[s] claiming the privilege must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process."

811 F.2d at 144.

■ Stated another way, an applicant must establish that he or she was "professionally engaged in newsgathering" at the time it received the information sought to be discovered. *Don King Prods., Inc. v. Douglas*, 131 F.R.D. 421, 424 (S.D.N.Y.1990). The question is a "factual inquiry to be made by the [trial] court." *von Bulow*, 811 F.2d at 144.

■ The Bankruptcy Court's first basis for denying the journalist's privilege to S & P was that S & P had failed to establish newsgathering intent in connection with its receipt of information from Delta. The Bankruptcy Court found that:

> "11. The S & P Ratings Group was not acting as a journalist when it gathered the information sought by the subpoena."

> "12. The information sought by the Subpoena was gathered by the S & P Ratings Group for the purpose of determining the credit ratings for Delta Air

1. Although the Court is of the view that the Bankruptcy Court's orders implicate First Amendment issues and therefore are subject to a heightened level of scrutiny, *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1964); *cf. Piesco v. City of New York, Dep't of Personnel*, 933 F.2d 1149, 1156 (2d Cir.) (appel-late court reviews for itself district court's determination that statements do not address matters of public concern and therefore do not warrant First Amendment protection), *cert. denied*, —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991), such a heightened level of scrutiny has not been applied here because it would not change the outcome.

Lines, Inc. ('Delta') and not for any other purpose."

July 15 Order, ¶¶ 11–12.

In its briefs on appeal, Pan Am is unable to cite anything in the record which supports the Bankruptcy Court's finding as to S & P's operations. The *only* evidence on the issue is the affidavits of Edward Z. Emmer, Executive Managing Director in the Corporate Finance Department of S & P, in support of the contrary position. Mr. Emmer states that S & P "gathers and analyzes information about debt *for the purpose of publishing financial information and commentary* on domestic and foreign corporate and municipal debt obligations." Emmer 6/28/93 Aff., ¶ 2 (emphasis added). *See also* Emmer 6/8/93 Aff., ¶ 2 ("S & P is in the profession of gathering and analyzing information about debt and communicating that information to the public through its various publications"); Emmer 8/5/93 Aff., ¶ 2. Attached to Mr. Emmer's August 5, 1993 affidavit is the May 10, 1993 issue of S & P's *CreditWatch* which

demonstrates beyond peradventure S & P's publication of various financial information and commentary.

Mr. Emmer also describes at length, again without contradiction, S & P's editorial process.[2] Of particular interest is (i) S & P's gathering of a wide range of information from a variety of sources—including the issuer on both a confidential and nonconfidential basis—for the purpose and with the intent of publishing a rating, (ii) analysis of that information, (iii) internal consultation in formulation of a rating, and (iv) publication of the rating with accompanying analysis and commentary. Moreover, the parties do not disagree that the specific material sought by the subpoena *duces tecum* was generated in connection with Delta–S & P communications during S & P's process of rating Delta debt.

The record allows no other conclusion but that S & P functions as a journalist when gathering information in connection with its ratings process and specifically that it was functioning as a journalist, *viz.*, with the in-

---

2. Mr. Emmer's uncontradicted description of S & P's rating and editorial process is as follows:

"5. S & P's debt issue ratings are based on S & P's own assessment of the issuer's financial outlook. The issuer's financial projections are a valuable tool in the S & P rating process, as they reflect an issuer's plan for the future, its assessment of its prospects, and its strategy to deal with problems.

6. A substantial part of the information supplied by corporate and municipal issuers to S & P is highly sensitive and is supplied on a confidential basis. Such information is voluntarily provided by the issuers to S & P and, as the issuers expect, is used by S & P solely to determine credit ratings. The S & P Ratings Group keeps the information it receives strictly confidential, as S & P's publications themselves make clear. The information is not used for any other purpose or by any other division, as Standard & Poor's maintains a 'firm barrier' between its ratings activities and all of its other services, such as equity research.

7. The rating and editorial process begins at Standard & Poor's with a team of analysts assigned to a particular issuer. The analysts research the S & P library, internal files, and data-bases; review material received from the issuer; meet with the management of the issuing organization to discuss the debt issue; analyze all information received from the issuer; prepare a rating profile; and present the analysis to a Standard & Poor's rating committee.

8. The analysts' presentation to the rating committee (composed of a least three to five

voting members) often includes an evaluation of the issuing company's or government entity's strategic and financial management; its business and its operating environment; a financial analysis and accounting factors; its business and financing plans; and a rating recommendation. The committee then engages in a frank and animated—indeed, often blunt and heated—exchange regarding the appropriate rating for the issue. As in all committee meetings of any type, members forcefully advocate their own rating opinions until a committee rating is ultimately determined. The issuers may respond to the rating prior to its publication by presenting new or more information, and the committee will then reconvene to consider this information before a final rating is reached.

9. Once a final rating is determined, it is published by S & P, sometimes along with a narrative rationale authored by an analyst. S & P provides its credit risk evaluations to the public in the form of widely understood letter symbols. Detailed research, analysis and judgment of S & P analysts stand behind each letter rating, and are displayed in the corporate 'rating rationale' reports and industry analyses that also appear in S & P publications. When a rating change is anticipated or occurs, S & P analysts report on the change and the rationale for it in *CreditWeek* (which includes a section entitled 'CreditWatch') and through 'CreditWire.' Thus, S & P's credit risk analysts serve as its reporters as well." Emmer 6/8/93 Aff., ¶¶ 5–9.

tent to use the material to disseminate information to the public, when it gathered the information sought here by Pan Am. Insofar as the Bankruptcy Court concluded otherwise, its finding is without support in the record and clearly erroneous.

In finding S & P to have had the requisite newsgathering intent at the time of the relevant meetings and, therefore, the journalist's privilege to be applicable, the Court does not ignore Pan Am's contention that even if S & P does generally gather information with the intent to disseminate news, it did not intend to disseminate the particular information sought by Pan Am's subpoena. Pan Am relies on a finding of the Bankruptcy Court that "[t]he S & P Ratings Group never intended to disseminate to the public the information gathered for the purposes of its ratings process" for Delta Air Lines. July 15 Order, ¶ 13. From this proposition, Pan Am concludes—and the Bankruptcy Court apparently agreed—that S & P may not invoke the journalist's privilege to shield the information Pan Am seeks.

Although perhaps not necessary to the result here, as a matter of law, that conclusion is incorrect. S & P does not dispute that it accepts some information from issuers with the condition that it be kept confidential. *E.g.*, Emmer 6/8/93 Aff. ¶ 6; 6/28/93 Aff. ¶ 5. For example, information as to future projections and other "soft" information is sensitive and proprietary, and issuers have a legitimate expectation that S & P will not reveal it.[3] It would be ironic, to say the least, if S & P were now forced to disclose Delta's information on account of its promise not to do just that, and the law does not compel such a counterintuitive result.

The journalist's privilege does not cover only that information which a journalist actually intends to publish. It extends to protect unpublished resource material as well.[4] *von Bulow*, 811 F.2d at 142. Here, Mr. Emmer states, again without contradiction, that:

> "While S & P's Ratings Groups maintains a firm barrier between it and other divisions of S & P, such as equity research, this does not mean that the information gathered by S & P's Ratings Group enabling it to evaluate the creditworthiness of an issuer or debt instruments is limited to the issuance of a rating. *All of the material obtained forms the basis of the commentary published with the ratings in CreditWeek and other S & P Ratings Group publications.* The information is used 'solely for the purposes of rating' only in the sense that S & P's Ratings Group does not share information received in confidence from issuers with other parts of S & P or McGraw–Hill, Inc. which may be involved in equity analysis or making investment recommendations. The phrase reflects no limitation on the S & P Ratings Group's use of the information for its own publication activities."

Emmer 8/5/93 Aff., ¶ 3 (emphasis added). See also ¶¶ 5–8 of the 6/8/93 Emmer Aff. set forth at note 2, *supra,* where, in describing S & P's editorial process, Mr. Emmer describes the use S & P makes of such confidential information as the issuer's financial projections in publishing its ratings, analysis and commentary.

Thus, the fact that S & P may not have accepted all of the information Pan Am seeks with specific intent to disclose that

---

**3.** To the extent that the Bankruptcy Court based its findings on the apparent view that "the securities laws ... require full and complete disclosure of material information," July 15 Order at ¶ 23, that statement is inapplicable to much of the information sought in the subpoena, *viz.,* information disclosed in confidence by Delta management. The future projections which issuers disclose to S & P and which S & P uses in its evaluation, *see* Emmer 6/8/93 Aff. at ¶¶ 5–9, are not required to be disclosed by the securities laws but are only subject to voluntary disclosure. *See generally, Disclosure of Projections of Future Economic Performance and Safe–Harbor Rule for*

*Projections,* Interpretive Releases Relating to the Securities Act of 1933 and the Exchange Act of 1934 and General Rules and Regulations Thereunder Nos. 33–5992 & 34–15305, 43 Fed.Reg. 53246 (1978); Victor Brudney, *Materiality and Soft Information Under the Federal Securities Laws,* 75 Va.L.Rev. 723 (1989).

**4.** Furthermore, contrary to Pan Am's argument, it is of no moment that Delta was not a confidential source. The journalist's privilege "can be invoked to shield nonconfidential sources." *von Bulow,* 811 F.2d at 143.

particular information does not render the privilege inapplicable because, as S & P has demonstrated without contradiction, the information sought by the subpoena was received as part of S & P's newsgathering process with the intent to disseminate information to the public. *von Bulow,* 811 F.2d at 144.

### B. *The nature of S & P's "speech"*

■ Apparently as a separate basis for its holding, the Bankruptcy Court agreed with Pan Am's argument that, as a matter of law, S & P's rating activities fall within the analysis of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).[5] To the extent that that finding is necessary to the Bankruptcy Court's holding, it is addressed here.

*Greenmoss* was a defamation action brought against Dun & Bradstreet, Inc. ("D & B") by a plaintiff who had been falsely reported as bankrupt in a D & B credit report. The issue before the Supreme Court was whether statements made in the credit report were speech on a matter of public concern so as to require a showing of actual malice on the part of D & B before punitive damages could be assessed against it. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In reviewing its "content, form, and context", the Court found that D & B's credit report was not speech on a matter of public concern. It emphasized that the defamatory report was targeted to a very limited audience and had, in fact, been issued to only five of D & B's subscribers, who were themselves bound to keep the information therein confidential. Additionally, the Court reasoned that the market-driven nature of the speech, and its objectively verifiable content, made heightened First Amendment protection unnecessary.

Turning to the matter at hand, first, as a matter of fact, the Bankruptcy Court's findings at paragraphs 14 and 15 of the July 15 Order that S & P receives a fee for its ratings activity and its conclusion that economic factors predominate in its ratings activities are clearly erroneous. The record is uncontradicted that S & P does not merely provide ratings to issuers who pay a fee. As Mr. Emmer stated, "S & P as a matter of policy and fact rates practically all public debt financings and preferred stock issues with or without a request or a fee from the issuer." Emmer 6/28/93 Aff., ¶ 3. Similarly, even without a request or fee from an issuer, S & P revises, updates and reviews a prior rating or analysis of an issuer or debt instrument on S & P's determination that such information is important to its readers or subscribers. Emmer 6/8/93 Aff., ¶ 3; Emmer 6/28/93 Aff. ¶ 3. Moreover, S & P does not merely depend on information provided by issuers to fill its publications, but rather conducts its own independent research with an eye toward publishing objective ratings for the benefit of the public. Emmer 6/8/93 Aff., ¶¶ 5–9, *supra,* at note 2. Finally, S & P at all times retains complete editorial control over the decision of which ratings to publish and the form and content of its ratings. Emmer 6/28/93 Aff., ¶ 3.

■ Second, as a matter of law, *Greenmoss* provides no support for the denial of the journalist's privilege to S & P. Initially,

---

5. Specifically, the Bankruptcy Court found:
  "14. The S & P Ratings Group receives a fee for its ratings activity."
  "15. Economic factors predominate in the conduct of the S & P Ratings Group's ratings activity."

    *   *   *   *   *   *

  "21. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) the United States Supreme Court found that Dun & Bradstreet, Inc. was not entitled to assert any special privilege under the First Amendment for its credit reports.
  22. The rating activities of the S & P Ratings Group in this case fall within the analysis of the United States Supreme Court in *Greenmoss,* as those rating activities are motivated solely by a desire for profit and are market-driven.
  23. The commercial nature of the ratings, taken together with the economic importance of candid exchange of information between the S & P Ratings Group and issuers of debt, and the scope of the securities laws which require full and complete disclosure of material information, ensures that there would be no chilling effect upon rating activities by enforcement of the Subpoena."
July 15, 1993 Order, ¶¶ 14, 15, 21–23.

it must be recalled that *Greenmoss* dealt not with the journalist's privilege but with the law of defamation. The Bankruptcy Court's attempt to read the case as a general denial of First Amendment privilege for all credit reporting was expressly rejected by the *Greenmoss* Court itself, which stated that "[t]he protection to be accorded a particular credit report depends on whether the report's content, form, and context indicate that it concerns a public matter." 472 U.S. at 762 n. 8, 105 S.Ct. at 2947 n. 8. Under that test, the denial of First Amendment protection to an objectively verifiable report of a company's bankruptcy, issued confidentially to the five subscribers in *Greenmoss*, can have no bearing on the application of the qualified journalist's privilege to the newsgathering activities of an institution like S & P, which, the uncontradicted record demonstrates, regularly publishes periodicals containing subjective financial analysis and commentary for widespread distribution to the public at large.[6]

The Bankruptcy Court's analysis of *Greenmoss* also ignores substantial authority holding that the financial press is fully shielded by the umbrella of the First Amendment. Cases in this Circuit and elsewhere have addressed the specific question of the applicability of the journalist's privilege to financial publications and concluded that the privilege does indeed cover such works. *See In re Petroleum Prods. Antitrust Litigation*, 680 F.2d 5 (2d Cir.1982) (finding privilege applicable to Platt's Oilgram Price Report, a newsletter relating to current events in the petroleum industry), *cert. den.*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *SEC v. Hirsch Org., Inc.*, 8 Media L.Rep. (BNA) 2421, 1982 WL 1343 (S.D.N.Y.1982) (finding privilege applicable to *Smart Money*, a financial newsletter). *See also Lowe v. SEC*, 472 U.S. 181, 210, 105 S.Ct. 2557, 2573, 86

L.Ed.2d 130 (1985) (publication containing factual information and commentary on general market conditions and trends entitled to First Amendment protection); *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) ("The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion"); *National Life Ins. Co. v. Phillips Publishing, Inc.*, 793 F.Supp. 627 (D.Md.1992) (*Profitable Investing*, a financial newsletter, was entitled to the actual malice standard); *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 690 F.Supp. 256 (S.D.N.Y.1988), *aff'd on other grounds*, 869 F.2d 175 (2d Cir.1989) (*Corporation Records*, an S & P publication summarizing the operations and finances of many corporations, was entitled to the actual malice standard); *In re Burnett*, Misc. No. 5216 (August 27, 1993) (N.J. Superior Ct.) (A.M. Best Company, which obtains information from insurance companies in order to rate those companies for a fee, entitled to journalist's privilege). Indeed, the journalist's privilege was recently specifically upheld as to S & P in circumstances very similar to those presented here. *In re Scott Paper Company Securities Litigation*, 145 F.R.D. 366 (E.D.Pa.1992). Thus, far from prohibiting application of the journalist's privilege here, the "content, form, and context" analysis prescribed in *Greenmoss* requires application of the privilege.

### C. *Pan Am's Showing of Need*

▮▮▮ The Bankruptcy Court correctly observed that the journalist's privilege is a qualified one and may be overcome by a showing of need by the party seeking disclosure. Such a party must make a clear and specific showing that the information sought is: (1) highly material or relevant; (2) necessary or critical to the maintenance of the claim; and (3) not obtainable from other

---

**6.** Equally unpersuasive is the Bankruptcy Court's reasoning that the profit-motivated nature of S & P's speech makes First Amendment protection unnecessary. Television reporters, newspaper publishers, and booksellers all receive First Amendment protection though their speech is profit-motivated. That a speaker seeks payment for his or her speech does not push him or her outside the realm of the Constitution. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02, 72

S.Ct. 777, 780–81, 96 L.Ed. 1098 (1952) (rejecting notion that motion pictures should not receive First Amendment protection because they are made and exhibited for profit); *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943) ("the mere fact that religious literature is 'sold' ... rather than 'donated' does not transform evangelism into a commercial enterprise.").

available sources. *See In re Petroleum Products Antitrust Litigation,* 680 F.2d at 7. The Bankruptcy Court determined that Pan Am had satisfied all three of these elements for each piece of information demanded by the subpoena.

S & P argues on appeal that Pan Am failed to establish any of these elements as to any of the material it seeks, but the Court finds that it need not take the inquiry that far. Upon consideration of only the third element, unavailability from other sources, the Court concludes that the Bankruptcy Court was clearly erroneous in finding that Pan Am had overcome S & P's assertion of privilege.

The subpoena *duces tecum* essentially sought from S & P any document in its possession relating to Delta that had been produced or received after January 1, 1991. The documents covered by this request can be broadly grouped into three categories: (1) notes prepared by S & P personnel of discussions and meetings with Delta representatives; (2) documents received from Delta; and (3) documents reflecting S & P's internal processes and deliberations concerning Delta. For each of these categories, Pan Am failed to clearly and specifically demonstrate the unavailability of the information from other sources.

Beginning with the notes, the Bankruptcy Court found that representatives from Delta and S & P met throughout the relevant time period, and that the meetings concerned issues relevant to the transaction between Delta and Pan Am. July 15 Order, ¶¶ 27–28. The Bankruptcy Court noted that Delta's production provided no information regarding what was said by either side at the Delta–S & P meetings, 7/15/93 Order, ¶ 31, and concluded that "the S & P Ratings Group is the only other party from whom information on the meetings and correspondence between Delta and the S & P Ratings group is available." *Id.* ¶ 32.

In support of the Bankruptcy Court's finding that Pan Am could not elsewhere obtain the information contained in S & P's notes, Pan Am argues that it has already deposed two representatives of Delta but has obtained no information about the Delta–S & P meetings. However, as S & P points out, these two depositions fall far short of the effort required to show unavailability when a constitutional privilege is sought to be overcome based on necessity. *See In re Petroleum Products Antitrust Litigation, supra* (overturning order requiring disclosure of a journalist's notes despite the fact that hundreds of depositions had been taken and others might be necessary). *See also Application of Behar,* 779 F.Supp. 273, 276 (S.D.N.Y.1991); *In re Consumers Union,* 7 Media L.Rep. (BNA) 2038 (S.D.N.Y.1981). This is particularly true in view of the fact that other available Delta personnel remain undeposed, including individuals who attended the meetings with S & P and whose identity is known to Pan Am.[7] At the very least, a party seeking to overcome a constitutional privilege on the basis of necessity must show that it has exhausted all other available non-privileged sources for the information. Here, Pan Am has not even worked up a sweat, much less exhausted itself.

The same conclusion obtains as to documents provided by Delta to S & P. Pan Am has failed to demonstrate why this material cannot be obtained from Delta, particularly from the as yet undeposed Delta personnel who attended the meetings with S & P.

Finally, with regard to S & P's internal documents, the Bankruptcy Court found that:

> The S & P Ratings Group is the only entity from whom information about the understanding of the S & P Ratings Group's analysts regarding Delta's intentions ... is available.

July 15 Order, ¶ 32. This finding, however, while perhaps correct, does not support Pan Am's attempt to overcome the privilege. The subject of the adversary proceeding is Delta's failure to honor its commitment to

7. In the argument before this Court on S & P's motion to stay the Bankruptcy Court's contempt order, Pan Am conceded that it had failed to depose these Delta representatives with direct knowledge of the meetings but claimed that those additional depositions would be a burden on the Pan Am estate. No authority has even been cited by Pan Am for the proposition that the requirement of unavailability is obviated by such hardship, even if proven.

586

fund Pan Am's reorganization. What S & P believed about Delta's intentions—whether contained in S & P's internal documents or not—is not highly material or relevant, necessary or critical to Pan Am's claim.

The only possible relevance S & P's internal documents could have in this proceeding is insofar as they record facts about Delta's statements or conduct with respect to honoring its commitment to fund Pan Am's reorganization. Yet assuming that such facts are contained in S & P's internal documents, Pan Am again has failed to show why those facts are not obtainable elsewhere, either from Delta itself, or from other sources.

The Court finds that Pan Am has not clearly and specifically demonstrated that the materials sought in its subpoena *duces tecum* are unavailable from any source other than S & P, and the Bankruptcy Court's contrary finding is clearly erroneous. Consequently, there is no basis to pierce the journalist's privilege and compel S & P to disclose such materials.

D. *Summary*

As a publisher of publicly distributed financial ratings, analysis and commentary, S & P is, as a matter of law, deserving of the full breadth of First Amendment safeguards. Having demonstrated that it gathered the material sought by the subpoena with news-gathering intent, S & P was entitled to invoke the journalist's privilege, subject only to a showing of need by Pan Am sufficient to defeat it. No such showing having been made, the Bankruptcy Court's July 15 Order denying S & P's motion to quash Pan Am's subpoena *duces tecum* was in error and, accordingly, is reversed.

III. The Contempt Order

 Where the underlying order that resulted in the finding of civil contempt is invalidated, a contempt order must also be reversed. *United States v. United Mine Workers of America,* 330 U.S. 258, 294–295, 67 S.Ct. 677, 696–697, 91 L.Ed. 884 (1947); *Heyman v. Kline,* 456 F.2d 123, 131 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972). The Court of Appeals has reversed civil contempt findings where,

as here, the underlying order improperly ordered the contemnor to disclose information. *See In re Petroleum Product, supra; United States v. Russotti,* 746 F.2d 945, 950 (2d Cir.1984).

Having found above that the Bankruptcy Court's July 15 Order denying S & P's motion to quash was invalid and finding that order to have been the only basis of the Bankruptcy Court's contempt order, the contempt order must also be, and hereby is, reversed.

*CONCLUSION*

The July 15 and August 5, 1993 orders of the Bankruptcy Court denying S & P's motion to quash and holding S & P in civil contempt, respectively, are reversed.