OPINION OF THE COURT
Carol R. Edmead, J.
In this special proceeding, petitioner, a large coal company, seeks pre-action disclosure, under CPLR 3102 (c), from an organization that provides information about distressed companies to investors.
Background
Recognizing that a free and vibrant press is a bulwark of democracy, New York has long been a strong defender of freedoms of the press. This motion requires the court to determine who belongs to this group. That is, the court must determine whether a company that offers information to institutional clients about distressed companies is disseminating that knowledge to the public, such that it, its employees, and its sources are protected by New York’s Shield Law (Civil Rights Law § 79-h).
Respondent Reorg Research, Inc. seeks to use the Shield Law to block petitioner Murray Energy Corporation from obtaining discovery about the confidential sources it used to write “alerts” sent to Reorg subscribers about maneuvers Murray made to lessen its debt burden. If these alerts had been written by a member of the press, the New York Times, for example, and disseminated to the public, application of the Shield Law would be straightforward: it would block Murray’s attempt to learn about the confidential sources. However, Re-org’s inclusion within the group protected by the Shield Law is more dubious than that of a newspaper.
*671 Reorg’s Business Generally
Reorg illustrates how technology is transforming the way Wall Street operates. In 2013, Kent Collier, its founder and CEO, launched the company and its proprietary software, which he hired programmers to write in 2012 (see petitioner’s exhibit 3; Daniel Fisher, In Or Out Of Bankruptcy, Reorg Research Is Watching, Forbes [June 1, 2016], available at http:// www.forbes.com/sites/danielfisher/2016/06/01/in-or-out-of-bankrtuptcy-reorg-is-watching/#37cac6bd20c7 [accessed Jan. 30, 2017]). The program allows Reorg to search Pacer, the electronic filing system for federal court cases, for information from bankruptcy cases that bear on investment decisions, faster than with traditional methods (id.). The utility of this software derives from a market context where obtaining information before the general public and other investors has significant value (id.).
Reorg has “a dedicated editorial team of journalists, former lawyers, and investment bankers that leverages the company’s proprietary technology to provide a comprehensive view” of debt-distressed companies in which the subscribers have an interest (Collier Oct. 17, 2016 aff f 3).[1] Collier stated in his affidavit that Reorg “has approximately 375 unique subscribers” and that “these subscribers include investment advisors and investment funds that advise or manage trillions of dollars in assets” (id.).[2]
While much has been said since the financial crisis of 2007-2008 about the means by which 1% of U.S. citizens retain a much larger percentage of the nation’s wealth, Reorg’s business involves a slightly different subject: the siloing of information, namely, market-moving information about debt-distressed entities, such as Murray and the territory of Puerto Rico (see Paul Steiger aff ¶ 23). That information is withheld from the public by confidentiality agreements in all of the “User Agreements” signed by Reorg’s subscribers (see petitioner’s exhibit 7).
*672 While the specific terms of those agreements are under seal, the court notes, generally, that the terms of confidentiality are constrictive and subscribers are not permitted to share the information provided to them by Reorg with nonsubscribers, even after the end of their subscription. The fact subscribers get information relevant to their investments and potential investments before the public is what makes Reorg’s services valuable (see petitioner’s exhibit 3, quoting Collier as stating: “We’re playing with microseconds here. When a new plan is filed that says bondholders will get 50 cents on the dollar and the bonds are trading at 80, there’s huge market implications for that information”).[3] According to Collier, the 375 clients pay well for this value: subscriptions, he states, range “from approximately $30,000 per year to $120,000 per year based on a variety of factors including, among other things, the size of the organization and the number of individual users” (Collier aff ¶ 3).
In its motion papers, Reorg refers to itself as a news organization. Collier, for example, styles his company as “a news organization that provides its subscribers with breaking news, market-moving intelligence, and independent analysis on the distressed debt and leveraged finance markets” (id. ¶ 2). However, in the press, Collier has been quoted as characterizing Reorg differently: “I call us an intelligence house, not a media organization” (petitioner’s exhibit 4; Robin Wiggles-worth, Kent Collier, Reorg Research: Bankruptcy Bulletins: The Clunkiness of US Court Filings Inspired a Thriving News Service for Distressed Debt Investors, Financial Times [Dec. 1, 2015]).[4] In the same piece, Collier went on to state that “[w]hen we do deep dives they’re more like research and analysis, but we also break stories. We put a lot of effort into getting our analysts, reporters and lawyers working closely together” (id.).
It is useful to observe that Collier uses the term “break a story” here in a unique way. Typically, the phrase refers to a news outlet that is the first to disseminate a story to the public.[5] In the usual scenario, the news outlet will allow other news agencies to quote or sample its reporting, as the story *673 spreads to larger swaths of the public (see Joel Kaplan Nov. 16, 2016 aff |¶ 79-80). Here, in contrast, Reorg’s confidentiality agreements provide a firewall to prevent its stories from breaking into public view. Thus, when Collier refers to Reorg breaking a story, he means providing it, exclusively, to 375 subscribers.
Reorg’s August 2016 Alerts Regarding Murray
Murray Energy is one of the debt-distressed entities about which some of Reorg’s subscribers have an interest. Max Frumes, the senior editor at Reorg who covers the company, describes it as
“one of the largest (if not the largest) thermal coal companies in the United States, producing approximately sixty-five million tons of bituminous coal each year, and employing over 6,000 people in six states. Murray Energy owns and operates twelve active mines at eleven mining complexes located in the United States and South America. Murray Energy is the largest member of the Bituminous Coal Operators Association (‘BCOA’), a coal industry group responsible for negotiating labor contracts with the UMWA [United Mine Workers of America], and Murray Energy’s Chief Executive Officer Robert Murray also serves as chairman of the BCOA. Given its size and significance, the operational, business and financial issues impacting Murray Energy typically impact the entire coal industry. While Murray Energy is a privately-owned company, it has issued bonds that are publicly traded” (Frumes Oct. 17, 2016 aff ¶ 10).
The events that give rise to this dispute started with an agreement between Murray and its unionized mine workers. Frumes saw two press releases trumpeting the deal {id. ¶ 10), and, like a good reporter (Frumes holds a Master’s degree in journalism [id. ¶ 10]), he followed up, calling four contacts who are knowledgeable about Murray to see if he could find a story behind the story {id. f 12). The sources not only verified the news about the collective bargaining agreement, but, after Frumes promised to keep their names confidential, the sources offered up additional information that became the basis for an *674 alert, written by Frames, that was emailed—on August 15, 2016—to Reorg subscribers following Murray, entitled “Murray Touts Successful Renegotiation With Union Amid Covenant Amendment Effort” (id. ¶ 17).
After the alert was sent, Frames remained dogged and followed up with his sources to ferret out any further developments (id. f 18). Two of his four sources gave him additional information, including information about negotiations with some of Murray’s debt holders, and he sent another alert, on August 17, 2016, entitled “Murray Finalizes Credit Agreement Amendment, Expects Annual Savings of $70M From Renegotiated Union Contract” (id. ¶¶ 18-21).
Frames, prior to sending out any of the alerts, had reached out to Murray’s assistant general counsel and media director, Gary Broadbent (id. ¶ 16), who did not get back to Frames until August 19, 2016, when he called Frames and followed up with a written statement (id. f 22). On the same day, Frames published an updated version of the August 17 alert, including the information conveyed by Broadbent.
Murray believes that, because of the close way it controls information, the confidential sources must have been from a group of investors that were sent two PowerPoint presentations in advance of an investor teleconference on August 23, 2016 (Broadbent Nov. 16, 2016 aff ¶¶ 14-17). Murray, on August 3, 2016, uploaded the first presentation, simply titled “Lender Presentation,” to “a secure Intralinks data site” (id. ¶ 14). According to Broadbent, the presentation involved information about Murray’s earnings before taxes, interest, taxes, depreciation, and amortization and its approach to a particular credit agreement (id.). All of the investors with whom the presentation was shared were required to sign confidentiality agreements, and, according to Broadbent, the information contained in the presentation was not shared with any third parties who were not bound by confidentiality agreements (id. ¶ 15).
Broadbent also explains, dramatically and at length, why it endeavors to hold closely the information that ended up in Re-org’s alerts:
“The Confidentiality Information contained with the Lender Presentation and protected by the Confidentiality Agreement revealed vital clues about Murray Energy’s business strategy and overall financial condition. This [is] information that would be of great interest to potential hostile inves *675 tors considering a possible takeover of Murray Energy (which can conceivably be orchestrated through a massive purchase of public debt). The information would also give competitors in the coal industry an unfair advantage because it offers a detailed and concrete window into how Murray Energy is handling the ups-and-downs of the turbulent coal market at a specific point in time and because it enables competitors to disparage Murray Energy by criticizing its financial condition for their gain. Armed with this knowledge about how and what privately held Murray Energy is currently doing and its current financial condition, hostile investors can determine whether to target Murray Energy for take over and competitors can usurp opportunities from Murray Energy to Murray Energy’s great detriment and possible destruction” (id. ¶ 17).
Motion for Pre-Action Discovery
Given the gravity with which Murray views its confidential information, it wants to sue the investors who, it believes, breached their confidentiality agreements. However, Reorg will not disclose the names of the anonymous sources who provided Frumes with information about Murray. Thus, on September 16, 2016, Murray filed this motion for pre-action discovery in order to learn the names of those sources. Specifically, Murray seeks an order compelling Reorg to “disclose the name(s) and contact information of John Does 1-10, and any and all documents, including electronically stored information, constituting or relating to communications between John Does 1-10 and Re-org” about Murray’s confidential information (Murray’s CPLR 3102 [c] petition ¶ 36). In the alternative, Murray seeks an order granting it leave to serve Reorg with a subpoena compelling Reorg to make these disclosures (id.).
In opposition, Reorg argues that the Shield Law protects it from having to divulge the names of its sources. In support of this argument, Reorg submits an affidavit from Paul Steiger, a venerable longtime journalist. Among other things, Steiger was a managing editor of the Wall Street Journal in the 1990s and he founded ProPublica in 2008 and served as its editor in chief, CEO, and president until 2012 (Steiger aff ¶¶ 7-10).
Steiger opines that Reorg is a “journalism company,” because of “the nature of the products and services it delivers, the way it manages and operates its content-producing editorial staff, *676 and the kinds of people it recruits and employs” (id. ¶ 19). Steiger also opines that Reorg’s reporting serves the public interest, without explaining why that is the case (id. f 19). Steiger concludes his affidavit with a concern about the prec-edential effect of forcing Reorg to disclose its sources: “To force disclosure of the confidential sources would seriously harm the ability of Reorg Research—and by fear of precedent, all journalistic organizations—to produce and unearth information of great value to the public interest” (id. ¶ 34).
Steiger, however, never addresses the fact that Reorg’s reporting is never shared with the public, and is, instead, intentionally kept from the public by means of constrictive confidentiality agreements. This lack of publication to the public is the central plank in Murray’s argument that Reorg is not entitled to protection under the Shield Law.
Reorg also argues that, even if it could not rely on the Shield Law, Murray’s application for pre-action discovery is improper because: (1) it is not supported by factual affidavits; and (2) its purpose in seeking the information is to determine whether it has a cause of action. In reply, Murray contends that its verified petition is sufficient basis on which to move, and that it is seeking the disclosure to find the identities of the John Doe defendants, rather than determining whether it has a cause of action.
Discussion
I. Standard for Pre-Action Discovery under CPLR
CPLR 3102 is entitled “Method of obtaining disclosure,” and its third subdivision, “Before action commenced,” provides, in relevant part, that “[b]efore an action is commenced, disclosure to aid in bringing an action, to preserve information or to aid in arbitration, may be obtained, but only by court order” (CPLR 3102 [c]). As to the dimensions and parameters of this provision, the First Department has stated that “while pre-action disclosure may be appropriate to preserve evidence or to identify potential defendants, it may not be used to ascertain whether a prospective plaintiff has a cause of action worth pursuing” (Matter of Uddin v New York City Tr. Auth., 27 AD3d 265, 266 [1st Dept 2006], citing Matter of Gleich v Kissinger, 111 AD2d 130, 131-132 [1st Dept 1985]).
Moreover, “ ‘[a] petition for pre-action discovery should only be granted when the petitioner demonstrates that he has a meritorious cause of action and that the information sought is *677 material and necessary to the actionable wrong’ ” (id., quoting Holzman v Manhattan & Bronx Surface Tr. Operating Auth., 271 AD2d 346, 347 [1st Dept 2000]). As a general rule, “ ‘the adequacy of merit rests within the sound discretion of the court’ ” (Matter of Peters v Sotheby’s Inc., 34 AD3d 29, 34 [1st Dept 2006], quoting Mediavilla v Gurman, 272 AD2d 146, 148 [1st Dept 2000]).
Aside from asserting journalistic privilege under the Shield Law, Reorg makes two arguments against the propriety of Murray’s application under CPLR 3102 (c): (1) that it is defective, as it is not supported by an affidavit; and (2) that it improperly seeks to ascertain whether it has a cause of action. While both parties treat these arguments as secondary, younger-sibling issues—as compared with the question of whether the Shield Law applies—it makes more sense, analytically, to address these arguments first, since if either of them are correct, there is no need for the court to address the Shield Law.
First, Reorg argues that factual affidavits are an “indispensable component of a petition for pre-action disclosure” (mem of law in opposition at 17). In support of this dubious proposition, Reorg cites to an Appellate Division, Third Department case from 1982 that states no such requirement (Emmrich v Tech. for Info. Mgt., 91 AD2d 777 [3d Dept 1982]). In Emmrich, where a minority shareholder wanted to bring an action against a technology company, the court reversed the trial court’s grant of pre-action discovery, as the Third Department found that plaintiff’s factual showing did not “fairly indicate [ ] any actionable wrong against [the] defendant” (id. at 778 [internal quotation marks omitted]). While the shareholder submitted an affidavit with his petition (id. at 777-778), the Court never stated that affidavits were an “indispensable component” of applications for pre-action discovery.
Murray argues, in reply, that its verified petition presented a sufficient factual predicate for pre-action discovery, citing to Matter of Ero v Graystone Materials (252 AD2d 812, 814 [3d Dept 1998]) which held that “documents submitted to demonstrate the existence of a prima facie cause of action must be based on first-hand knowledge.” Clearly, Murray has satisfied this technical requirement with its petition, verified by Robert Moore, its executive vice-president, who is familiar with the facts underlying this dispute.
Second, Reorg argues that Murray does not know, with any degree of certainty, that Frumes’s sources were potential inves *678 tors who violated confidentiality agreements, and is, thus, using CPLR 3102 as a vehicle to find out if it has cause of action. However, the verified petition is “entitled to the benefit of every favorable inference” at this stage, and it clearly makes out a prima facie claim against the sources (id. at 814). As such, there is no technical defect in Murray’s application for pre-action discovery, and the court will move on to the question of whether the Shield Law applies to Reorg.
II. Shield Law
The Shield Law is more than simply a codification of the common-law journalist’s privilege. New York extends broader protection to the press than that which the common law provides (see In re Fitch, Inc., 330 F3d 104, 109 [2d Cir 2003] [noting, in a case involving whether the Shield Law applies to information-gathering organizations, that the parties agreed that “the New York rule is more journalist-protective” than the common-law privilege]).
The Court of Appeals, the last time it had an opportunity to consider the Shield Law, in Matter of Holmes v Winter, traced New York’s tradition “of providing the utmost protection of freedom of the press” back to colonial times (22 NY3d 300, 307 [2013]). This tradition, the Court pointed out, is not only embodied in the Shield Law, but also in article I, § 8 of the New York Constitution, which adopts “more expansive language” than the First Amendment of the Bill of Rights (id.).[6] The Court concluded:
“New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—and their confidential sources— that has been recognized as the strongest in the nation. And safeguarding the anonymity of those who provide information in confidence is perhaps the core principle of New York’s journalistic privilege, as is evident from our colonial tradition, the constitutional text and the legislative history of the Shield Law”[7] (id. at 310).
*679 In 1970, when the Shield Law was first adopted, Governor Nelson Rockefeller issued a memorandum approving the legislation. In it, he described freedom of the press as “one of the foundations upon which our form of government is based,” and he added that “[a] representative democracy, such as ours, cannot exist unless there is a free press both willing and able to keep the public informed of all the news” (Governor’s Approval Mem, Bill Jacket, L 1970, ch 615 at 91). The Governor trumpeted that the Shield Law—known originally as the “Freedom of Information Bill For Newsmen”—“will make New York State—the Nation’s principal center of news gathering and dissemination—the only state that clearly protects the public’s right to know” (id.). While these words are worth recalling as a statement of core values, for the purposes of this motion, it is important that the Governor, in expressing his own and the legislature’s intent, referred in both of these formulations to dissemination of information to the public. That is, the essence of the press’s value is that it informs the public.
This idea is memorialized in the text of the Shield Law, which, over the years, the legislature has amended to strengthen the protections New York offers to the press. The statute defines a “professional journalist” as
“one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, press association or wire service or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public, such [a] person shall be someone performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of communication” (Civil Rights Law § 79-h [a] [6] [emphasis added]).
The statute protects professional journalists from being held in contempt for refusing to disclose their confidential sources.
*680 “Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist.. . shall be adjudged in contempt by any court in connection with any civil or criminal proceeding . . . for refusing or failing to disclose . . . the identity of the source of any such news coming into such person’s possession in the course of gathering or obtaining news for publication” (id. § 79-h [b] [emphasis added], as added by L 1970, ch 615, as amended by L 1975, ch 316; L 1981, ch 468; L 1990, ch 33, § 1).
Moreover, the statute renders information subject to the privilege, such as the names of confidential sources, “inadmissible in any action or proceeding or hearing before any agency” {id. § 79-h [d]). There is another branch of the statute—not applicable here, as Frumes was clearly dealing with confidential sources—that grants a “qualified privilege” where news was “not obtained or received in confidence” {id. § 79-h [c]).[8] Thus, it is clear that if Frumes is a professional journalist under the Shield Law, he and Reorg are protected from responding to Murray’s attempt to learn the names of his sources.
The key phrase in the statute’s definition of “professional journalist,” for the purpose of resolving this motion, is “news intended for dissemination to the public” (Civil Rights Law § 79-h [a] [6]). The statute enumerates a number of categories of news organizations for which a professional reporter may work, such as a newspaper or magazine—none of which Reorg fits into—and closes the list with a catchall category: “or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public” {id.). If Reorg does not fit within this catchall category, it does fit within the protections of the Shield Law.
The information that Frumes gathered about Murray, while it may have been news, was never intended for dissemination to the public. Instead, the confidentiality restrictions that Re-org places on all of its subscribers prevent dissemination to the public. Those restrictions are what makes Reorg’s information *681 valuable to its high-end investors: gaining knowledge before the general public allows these investors to stay ahead of the market. Thus, while the court agrees with Steiger that Frumes is trained as a journalist and maintains the habits and skills of a journalist, he is not a journalist under the Shield Law, because he does not share his alerts with the public. That is, he applies his journalistic skills to keeping a small group of high-end entity investors well informed about debt-ridden entities.
This, simply, is not activity covered by the Shield Law, as it does not involve dissemination to the public. This conclusion comports with the federal court cases cited by both parties. In trying to distinguish In re Fitch from this proceeding, Reorg notes that the company which sought to invoke the Shield Law there, Fitch—which rates securities and debt offerings—“only ‘reports on’ specific transactions for which it has been hired” (330 F3d at 109). That feature, it is true, was determinative in the Second Circuit’s holding that Fitch was not protected by the Shield Law, as “this practice weighted] against treating Fitch like a journalist” (id.). However, what Reorg ignores is that Fitch had already cleared a threshold that it does not: it disseminates its information to the general public (id. at 106). As the Court found:
“Fitch communicates its rating [s] to the client, but also makes rating information available to the general public for free for a limited time on its web site. When the short period of time that the ratings reports are publically available expires, the ratings are transferred to an archive, where they may be retrieved by customers that pay a subscription fee for the privilege” (id.).
If Reorg published its alerts to the general public for, say, 24 hours and then archived the alerts in a database only search-able by its subscribers, the resolution of this special proceeding may have come out differently. However, it does not make any publication to the general public and its subscriptions are open only to entity investors. Other federal court cases comport with the general proposition that dissemination to the general public is a requirement for journalistic privilege (see In re Pan Am Corp., 161 BR 577 [SD NY 1993]; In re Scott Paper Co. Sec. Litig., 145 FRD 366 [ED Pa 1993]).
In re Pan Am involved a subpoena served on Standard & Poor’s Corporation (S & P), a ratings agency, that “publishes *682 its ratings and other financial information in periodicals” (161 BR at 579 [the court ultimately found that the journalistic privilege applied to S & P]). Similarly, In re Scott Paper, which also involved S & P, the court affirmed its prior holding that “S & P is a member of the press entitled to assert a qualified journalist’s privilege against compelled discovery” (145 FRD at 371). Clearly, S & P is considered a news organization, while Reorg is not, because S & P disseminates its news to the general public.[9]
Moreover, Fitch’s attempts to compare its subscription model to that of true news organizations like the New York Times and the Wall Street Journal, which also charge subscription fees, is unavailing. First, unlike Reorg, those newspapers do not charge tens or hundreds of thousands of dollars for annual subscriptions, and those subscriptions are open to members of the general public, not just entity investors. Second, stories published by those newspapers become part of the public record, through application of the fair use doctrine. Thus, members of the general public benefit from these newspapers, whether they have a subscription or not. In contrast, Reorg strictly keeps its stories away from the general public. Thus, the conclusion that it is not a news organization under the Shield Law is unavoidable.
This result aligns with First Amendment jurisprudence. In Dun & Bradstreet, Inc. v Greenmoss Builders, Inc. (472 US 749 [1985]), the Supreme Court held that a credit-reporting company that “provides subscribers with financial and related information about businesses” engages in “purely private” speech, which is of “less First Amendment concern” than “speech on matters of public concern that is at the heart of the First Amendment’s protection” (j.d. at 751, 758-759 [internal quotation marks and citation omitted]). The Court, in determining that—for purposes of a defamation claim—Dun & Brad *683 street engages in private speech, noted that, like Reorg, Dun & Bradstreet required, under subscriber user agreements, that “the subscribers may not reveal” the business information it provided “to anyone else” (id. at 751).
Dun & Bradstreet differs, analytically, from our proceeding, in that the Court’s ruling went to the nature of the speech, whereas we make no ruling as to whether Reorg’s alerts are speech on matters of public concern, and instead hold that Re-org is not entitled to protection from the Shield Law, because it does not disseminate its alerts to the public. The lessened protection, however, for entities that withhold their speech from the public, is consistent (see also Huggins v Moore, 94 NY2d 296, 303 [1999] [like Dun & Bradstreet, Huggins involved a defamation claim; the Court in Huggins cited Dun & Bradstreet for the proposition that “publications directed only to a limited, private audience are matters of purely private concern” (internal quotation marks and citation omitted)]).
This lessened protection for Reorg is consistent with New York’s tradition of upholding freedoms of the press: extraordinary protections are afforded to the press by our laws because of the public good it provides to our people. The press would not be better protected by an extension of its freedoms to companies, like Reorg, that do not carry out the vital function of informing the public.
The court does not lightly disagree with Steiger, who, for decades, has carried out this function with distinction. However, Steiger’s opinion that “[t]he enterprise shown by Re-org Research to go beyond the company’s announcements by seeking and obtaining additional key information from confidential sources . . . significantly serves the public” is con-clusory and unconvincing (Steiger aff ¶ 33). If Steiger had supported this opinion with some support showing that “vulture funds” gaining information before the general public has some benefit to the public, then it may have been persuasive. As to Steiger’s concern that a ruling against Reorg will weaken the protections afforded to “all journalistic organizations” (id. ¶ 34), the court notes, by way of reassurance, that this decision is narrowly fashioned to apply only to a company that deliberately keeps its information from reaching the general public.
Conclusion
Accordingly, it is ordered that petitioner’s application for pre-action disclosure is granted and respondent Reorg is directed *684 to disclose the names and contact information of John Does 1-10, and any documents, including electronically stored information, constituting or relating to communications between John Does 1-10 and Reorg Research as to petitioner’s confidential information.

. Subscribers can choose the distressed entities about which they receive updates.

. As to the subscriber base, Daniel Fisher of Forbes writes: “Some publicly traded high-yield debt funds subscribe, as do law firms and most of the distressed-debt ‘vulture’ hedge funds that play a growing role in bankruptcy battles” (Daniel Fisher, In Or Out Of Bankruptcy, Reorg Research Is Watching, Forbes [June 1, 2016], available at http://www.forbes.com/sites/ danielfisher/2016/06/01/in-or-out-of-bankrtuptcy-reorg-is-watching/ #37cac6bd20c7 [accessed Jan. 30, 2017]).

. See also petitioner’s exhibit 4; Robin Wigglesworth, Kent Collier, Reorg Research: Bankruptcy Bulletins'. The Clunkiness of US Court Filings Inspired a Thriving News Service for Distressed Debt Investors, Financial Times (Dec. 1, 2015), quoting Collier as saying "you want to be ahead of the news.”

. Murray notes that, at least as of November 16, 2016, Reorg refers to itself as a financial services company on Linkedln.

. See e.g. The Free Dictionary by Farlex, Idioms, break a story (http:// idioms.thefreedictionary.com/break+a+story [accessed Jan. 30, 2017] [defin *673 ing the term as “(for a media outlet) to be the first to broadcast or distribute the story of an event”]).

. Our State Constitution provides that “[e]very citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech or of the press” (NY Const, art I, § 8).

. Matter of Holmes arose from press coverage of the 2012 mass shooting in Aurora, Colorado and involved a Colorado court’s attempt to compel a New *679 York reporter to testify as to her law enforcement sources, who informed her reporting on the shooter; the Court concluded that, under CPL 640.10 (2), New York was not required to compel the reporter to travel to Colorado to testify, as giving up her sources and New York’s journalistic privilege constituted an “undue hardship” under the criminal procedure statute (22 NY3d at 311-320).

. In such cases, courts will still not compel the naming of sources unless “the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party’s claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source” (Civil Rights Law § 79-h [c]).

. While in the early 90s, when In re Pan Am and In re Scott Paper were published, S & P only published its ratings in trade periodicals such as “CreditWeek, High Yield Quarterly, and Ratings Handbook” (In re Pan Am, 161 BR at 579), Reorg’s alerts are not analogous to publication in trade periodicals for two reasons. First, a trade publication subscription does not cost tens or hundreds of thousands of dollars per year, as a Reorg subscription does, and they are open to the general public, not just entity investors, unlike Reorg subscriptions. Second, once information is published in a trade magazine, it becomes part of the public record and subject to fair use; this is not true of Reorg’s information, which is strictly held back from entering the public record.