**In re COUNTY OF ORANGE, a political subdivision of the State of California, Debtor.**

**County of Orange, a political subdivision of the State of California, Plaintiff,**

**v.**

**McGraw–hill Companies, Inc., a New York corporation, d/b/a Standard & Poor's, its unincorporated division, Defendants.**

**No. SACV 96–0765–GLT.
Bankruptcy No. SA 94–22272–JR.
Adversary No. SA 96–1624 JR.**

United States District Court, C.D. California.

March 18, 1997.

J. Michael Hennigan, James W. Mercer, Hennigan & Bennett, Los Angeles, CA, for plaintiff.

Geoffrey L. Thomas, Eve M. Coddon, Paul Hastings Janofsky & Walker, Los Angeles, CA, Donald L. Morrow, Steven D. Allison, Paul Hastings Janofsky & Walker, Costa Mesa, CA, Brian A. Sun, Frederick D. Friedman, Ellyn S. Garofalo, O'Neill Lysaght & Sun, Santa Monica, CA, for defendants.

Stephen M. Sacks, Daniel M. Lewis, M. Sean Laane, John A. Freedman, Arnold & Porter, Washington, DC, Lawrence Allen Cox, Arnold & Porter, Los Angeles, CA, for Federal National.

## RULING ON APPEAL

TAYLOR, District Judge.

### I. BACKGROUND

On December 6, 1994, the County of Orange filed its chapter 9 bankruptcy petition. The County now seeks to hold various entities including defendant McGraw–

Hill d/b/a Standard's & Poors ("S & P") responsible for the events leading to the County's bankruptcy.

The County alleges S & P was retained in 1993 and 1994 to render bond rating and investment services to the County. The County and S & P entered into separate agreements for each of the debt offerings the County made between 1993 and 1994. These agreements were called "Memorandum of Agreement[s]—re Municipal Debt Contract Ratings." (MOA's).

The County maintains S & P breached the MOA's by providing rating analyses which wrongly represented and concluded the County's financial condition and ability to repay the debt were fundamentally sound. S & P's ratings, information and analysis were important factors in the County's decision to issue the 1993 and 1994 debt securities. Without the ratings and analysis S & P provided the County would not have (nor been able to) market the 1993 and 1994 debt securities.

In addition, the County contends S & P negligently performed the rating services giving rise to tort liability. Specifically the County maintains S & P knew, or recklessly disregarded, facts showing the debt bond offerings were inappropriate and unsound. The County further asserts S & P either knew, or in the exercise of professional care should have known, the California State Constitution and other statutory restrictions prohibited the risky strategy.

If S & P had complied with its contractual and professional duties, the County argues it would have known:

1. Citron and Raabe misrepresented the safety of the County's investment portfolio;

2. The County's equity and liquidity were at extreme risk from rising interest rates;

3. Citron and Raabe's plan in 1994 to expand the scope of the interest rate bet to which they intended to commit the County and the Pool threatened major additional losses; and

4. Relying on the County's assets, particularly its investment portfolio, as a source of repayment upon bond maturity was extremely risky and imprudent.

If S & P revealed any significant portion of the material facts and risks of which it was aware, the County claims it would have terminated the offerings, stopped purchase of long-term securities and restructured the Pool. Thereby, it alleges, the County could have avoided approximately $500 million in losses.

This matter was referred to the Bankruptcy Court until October 17, 1996. S & P filed its motion to dismiss for failure to state a claim on August 29, 1996. In the Order Granting Motion to Withdraw the Reference, this Court conditioned the withdrawal upon the filing of the Bankruptcy Court's ruling on S & P's motion. The Bankruptcy Court granted S & P's motion to dismiss the County's claims for aiding and abetting breach of a fiduciary duty, but denied the motion to dismiss the breach of contract and professional negligence claims. S & P has appealed the denial of the motion to dismiss those claims to this Court. The County has not cross-appealed.

## II. DISCUSSION

Ordinarily, district courts exercise *de novo* review of the Bankruptcy Court's ruling on legal issues. *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 326 (9th Cir.1994). Given the First Amendment implications of the issues presented, this Court must conduct a searching and independent review of the entire record. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 497–510, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *In re Pan Am Corp.*, 161 B.R. 577, 580 at n. 1 (S.D.N.Y.1993).

Under Fed.R.Civ.P. 12(b)(6), a claim may be dismissed if it fails to state a claim upon which relief may be granted. A claim should not be dismissed under

Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99 (1957). When deciding a motion to dismiss, courts "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the non-moving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.1987). Additionally, courts must assume all general allegations "embrace whatever specific facts might be necessary to support them." *Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517, 521 (9th Cir.1994). However, the Court need not accept as true conclusory allegations or legal characterizations. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

### 1. Breach of Contract

S & P contends the County cannot state a claim for breach of contract because S & P performed all of the obligations of the contract. S & P urges this Court to read the MOA's themselves and determine whether the County has alleged a breach of the duties established in the MOA's. The County did not attach copies of the MOA's to the Complaint but purported to quote directly from their language in the body of the Complaint.

The Court disagrees with S & P that the County misrepresented the terms of the MOA's. The County accurately quoted language of the MOA's in the complaint. In the MOA's (as described in the Complaint) the description of S & P's obligations is both brief and vague:

> Standard & Poor's Corporation (S & P) rates the creditworthiness of specific bonds or debt obligations for a fee upon written request from an issuer, or from an underwriter, financial consultant, institution or other purchaser, provided that the issuer has knowledge of the request.
> The fee is based on the time and effort to determine the rating and accrues upon completion or termination of the rating process and is not contingent upon the sale of the bonds or debt obligations. The fee is not a payment to circulate, disseminate or publicize the rating. However, S & P has the right to disseminate the rating to its own customers and subscribers or through its own or other media. Expenses incurred, such as those for meetings outside S & P's offices or for field trips, are also payable to S & P.
>
> The Applicant agrees to provide or otherwise furnish to S & P all pertinent information in a timely manner together with all subsequent material changes in and additions to such information prior to, at the time of, and subsequent to the assignment of the rating. Failure to furnish information in a timely manner may result in no rating or withdrawal of the rating. S & P relies on the party submitting such information for its accuracy and completeness and substantiation thereof.
>
> It is understood that the rating is an evaluation of the information submitted and does not involve an audit by S & P. S & P has the right to raise, lower, suspend or withdraw the rating at any time, in its sole discretion, depending on the information S & P then has, or the lack thereof, or other circumstances, including, but not limited to, issuance of new bonds or debt obligations by the issuer, all without notice.

The MOA's specify with respect to municipal bonds "[a] Standard & Poor's note rating reflects the liquidity concerns and market access risks unique to notes."

S & P contends it fulfilled its obligations under the MOA's when it issued a rating to the bonds, and cannot, as a matter of law, have breached the contract. Strictly construed, the MOA's do not specifically state S & P must provide an accurate rating. However, the language of the MOA's and potential evidence extrinsic to the MOA's imply both the County and S &

P understood S & P's obligations exceeded simply providing a rating.

For example, the MOA's leave the ability to modify or suspend a rating based on new or different information in S & P's sole discretion. Also, S & P in effect warrants its municipal bond ratings reflect certain risks and concerns particular to those notes. Although these terms do not ensure S & P's ratings will be accurate, they may indicate S & P agreed to do more than randomly assign a rating to the County's debt offerings.

The Complaint includes allegations S & P considered its contract to exceed providing a rating. For example, S & P filed (although it later withdrew) a proof of claim in the Bankruptcy Court for thousands of dollars in what it characterized as "analytical services," not rating services or rating provision. In the light most favorable to the County, the contracts may have embodied more than the general language in the MOA's and may have required S & P to exercise a certain standard of care in assigning the ratings. If so, S & P may be held liable for contract damages for failing to issue an accurate rating.

The parties dispute the meaning of the terms of their agreement. California law might require an examination of all evidence, extrinsic or otherwise, to determine the disputed terms of a contract. *Trident Ctr. v. Connecticut Gen. Life Ins. Co.*, 847 F.2d 564, 568–69 (9th Cir.1988) (Kosinski, J.)(relying on *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)). The MOA's contain no merger clause and neither party asserts they are fully integrated agreements.

The County refers to both the MOA's and S & P's proof of claim in the Complaint. If the Court were able to determine the terms of the contract between the County and S & P based on these documents alone, the issue could be decided as a matter of law on a motion to dismiss. But, these documents do little more than establish that the parties dispute the terms of the contract, and require examination of additional evidence external to the Complaint to determine the parties' intent. As such, the proper motion to resolve the dispute is summary judgment. *A. Kemp Fisheries Inc. v. Castle & Cooke, Inc.*, 852 F.2d 493, 496 (9th Cir.1988).

S & P contends even if it breached its contract the First Amendment prevents the County from recovering damages unless the County demonstrates the breach was done with "actual malice." S & P maintains the County's failure to allege actual malice renders its breach of contract cause of action fatally defective.

"[T]o advance society's interest in free and open discussion on matters of public concern and to avoid undue self-censorship by the press, the First Amendment establishes a broad zone of protection within which the press may publish without fear of incurring liability on the basis of an injurious falsehood." *Blatty v. New York Times*, 42 Cal.3d 1033, 1041, 728 P.2d 1177 (1986) (citations omitted). This broad protection is not diminished when the expression at issue is published and sold for profit. *Time, Inc. v. Hill*, 385 U.S. 374, 397, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

The County argues correctly S & P is not entitled to heightened First Amendment protection simply because of its status as a financial publisher. *See First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 802, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (Burger, C.J., concurring), ("Because the First Amendment was meant to guarantee freedom to express and communicate ideas ... [it] does not 'belong' to any definable category of persons or entities: It belongs to all who exercise its freedoms"). Consequently publishers are subject to nondiscriminatory, neutral laws which do not affect the impartial distribution of news. *Associated Press v. N.L.R.B.*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937) (publishers not immune

from the National Labor Relations Act), *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (publishers not immune from antitrust laws). *The question is not whether the defendant is a publisher but whether the cause of action impacts expression.*

To accommodate the "breathing-space" the First Amendment requires, a publisher will not incur liability for a false statement unless the statement was made with "actual malice" *i.e.* "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The "actual malice" standard applies to false statements about public figures (*Hustler Magazine,* 485 U.S. 46, 108 S.Ct. 876), and matters of public concern (*New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).[1]

Although these issues traditionally arise in libel or defamation actions, the actual malice standard applies to other causes of action when the plaintiff seeks compensatory damages arising from allegedly false statements. *See Hustler Magazine,* 485 U.S. 46, 108 S.Ct. 876 (intentional infliction of emotional distress); *Blatty,* 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 (intentional interference with prospective economic advantage); *Bose,* 466 U.S. at 493–514, 104 S.Ct. 1949 (product disparagement action); *Hill,* 385 U.S. at 387–88, 87 S.Ct. 534 (invasion of privacy).

The County's debt offerings presented matters of public concern. The County contends S & P's actions caused them to incur $500 million in debt and contributed to the largest municipal bankruptcy in history. S & P and the County agreed either could publicize the rating. *Compare Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761–62, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)(individual's credit report was not a matter of public concern because it was speech solely in the individual interest of the speaker and its specific business audience and was made available to only five subscribers who could not disseminate it further).

Based on these factors, S & P urges the application of the actual malice standard to the County's claims for damages stemming from S & P's allegedly inaccurate ratings. The Court agrees that, absent special circumstances, S & P's ratings of the debt securities might be protected by the actual malice standard.[2]

1. In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court modified its application of the *Sullivan* standard to matters of public concern. *Gertz* found a stronger state interest in compensating private figures for harm to their reputation inflicted by false statements than in protecting public figures from such harm even when the false statement involved a matter of public concern. 418 U.S. at 348–49, 94 S.Ct. 2997. However, *Gertz* requires private-figure libel plaintiffs seeking presumed and punitive damages to demonstrate actual malice if the libelous statements involved a matter of public concern.

2. The Court disagrees with a recent opinion from the Southern District of New York. In *LaSalle Nat. Bank v. Duff & Phelps Credit Rating Co.,* the district court stated the "Supreme Court has held the Times v. Sullivan 'actual malice' standard inapplicable to a credit reporting agency." 951 F.Supp. 1071 at 1097 (S.D.N.Y.1996) (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 762, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)). That statement of the law is too broad. *Dun & Bradstreet* involved a libel action by a private individual against a credit reporting agency for false statements appearing on her credit report. While finding presumed and punitive damages could be recovered even absent a showing of actual malice, the Supreme Court explained this holding depended on finding the individual's credit report was not a matter of public concern:

The dissent suggests that our holding today leaves all credit reporting subject to reduced First Amendment protection. This is incorrect. The protection to be accorded a particular credit report depends on whether the report's "content, form, and context" indicate that it concerns a public matter. 472 U.S. at 762, n. 8, 105 S.Ct. 2939.

The County maintains, and the Bankruptcy Court found, the First Amendment is inapplicable to the County's claims against S & P because the County seeks damages arising not from what S & P published but from S & P's breach of contract. Although this Court concludes the First Amendment does not bar the County's contract action, this conclusion is not based on the distinction between S & P's published ratings and S & P's pre-publication activity.

Publishers and reporters enjoy First Amendment protection long before they decide to release an article for public dissemination. In adopting the journalist's privilege against compelled disclosure of information, the Ninth Circuit noted the importance of avoiding the "lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled." *Shoen v. Shoen,* 48 F.3d 412, 416 (9th Cir.1995) (citations omitted).

Although this case differs factually from journalist privilege cases, those cases demonstrate the First Amendment's application to news-gathering as well as news-publishing activities. The County may not avoid the First Amendment and the actual malice standard simply by basing its cause of action on the preparation, rather than the publication, of the ratings. Despite the County's contention it was interested in the S & P rating for its own purposes and without reference to publication, the complaint establishes no distinction between the service the County requested from S & P and S & P's "publishing" activities:

> S & P specializes in gathering and analyzing public and private information about debentures. The results of the analysis are reported in a letter and/or number grade—"rating"—that expresses S & P's expert measurement of the likelihood of the issuer's risk of default on bond or note repayment. S & P compiles these ratings and provides them to issuers and investors. S & P's ratings are directly provided to anyone who subscribes to S & P's information services, such as S & P's CreditWeek. They are also widely publicized in debt markets and are seen and used as essential information by buyers and sellers of debts in determining the price and yield of particular instruments.

Compl. ¶ 86.

As pled, there is no difference between the "expression" in which S & P engages as a financial publisher and the conduct upon which the County bases its causes of action. S & P's expression is entitled to First Amendment protection. The Court cannot analyze the County's claims without reference to S & P's constitutional protection.

However, "[i]t is ... beyond dispute that 'the publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.'" *Cohen v. Cowles Media Co.,* 501 U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (citation omitted). The County maintains it is not seeking to enforce laws that target or single out the press. Rather, its complaint rests on generally applicable contract law.

*Cohen* involved a suit by an individual against two newspaper publishers under state promissory estoppel law. The plaintiff provided information to the newspapers on the condition they would keep his identity confidential. The newspapers identified the plaintiff in their stories. As a result, the plaintiff was fired. He sued the newspapers for breach of their promise not to identify him. *Id.* at 665, 111 S.Ct. 2513.

In finding the actual malice standard inapplicable to the lawsuit, the Supreme Court explained "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or

organizations." *Id.* at 670, 111 S.Ct. 2513. The Supreme Court found that state laws requiring those making promises to keep them allowed the parties themselves to determine the scope of their legal obligations. "[A]ny restrictions . . . placed on the publication of truthful information are self-imposed." *Id.* at 671, 111 S.Ct. 2513.

The County argues it only seeks to hold S & P to its promise to competently perform its rating service as described in the MOA's. Under *Cohen*, enforcement of generally applicable contract principles would not violate the First Amendment.

However, this case is significantly different from *Cohen*. In *Cohen*, the individual did not seek damages caused by a false statement. The parties conceded the newspapers accurately reported the plaintiff's name. S & P contends *Hustler Magazine* requires the application of the actual malice standard to any cause of action challenging the accuracy of published information.

S & P relies too heavily on *Hustler Magazine*. In *Cohen*, the Supreme Court distinguished the *Hustler Magazine* line of · cases:

> Nor is Cohen attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim. . . . Cohen is not seeking damages for injury to his reputation or his state of mind. He sought damages in excess of $50,000 for breach of a promise that caused him to lose his job and lowered his earning capacity. Thus this is not a case like *Hustler Magazine* . . ., where we held that the constitutional libel standards apply to a claim alleging the publication

of a parody was a state-law tort of intentional infliction of emotional distress.

501 U.S. at 671, 111 S.Ct. 2513. Similarly, the County seeks damages from S & P for breach of a promise allegedly causing the County to incur additional monetary damages, not damages to its reputation or mental state. The distinction between *Cohen* and *Hustler Magazine* lies not in the challenge to admittedly accurate rather than allegedly inaccurate information, but in the type of injury alleged. The factual inconsistencies between *Cohen* and the County's lawsuit do not undermine *Cohen'*s application to this case.[3]

The core of the County's complaint is that S & P contracted to render an opinion about the safety of the debt offerings, but performed inadequately. As such, the impact of a damage award on S & P's protected expression must be carefully considered. The Supreme Court recognized:

> Fear of large verdicts in damage suits for innocent or merely negligent misstatement in their defense, must inevitably cause publishers to "steer* * *wider of the unlawful zone" (citation omitted); and thus "create the danger that the legitimate interest will be penalized." (citation omitted).

*Hill,* 385 U.S. at 389, 87 S.Ct. 534. When considering a breach of contract action, courts cannot ignore the possibility an action seeking damages arising from a misstatement may have the same "chilling" effect if the courts impose on the publishers duties they did not intend to undertake by entering the contract.

---

**3.** This conclusion is in agreement with other legal authority.

> *In the absence of a contract,* fiduciary relationship, or intentional design to cause injury, a newspaper publisher is not liable to a member of the public to whom all news is liable to be disseminated for a negligent misstatement in an item of news, not amounting to libel, published by the publisher, unless he wilfully originates or circu-

lates it knowing it to be false, and it is calculated to and does, as the proximate cause, result in injury to another person. *Gutter v. Dow Jones, Inc.,* 490 N.E.2d 898, 900 (Ohio 1986) (quoting 58 Am.Jur.2d 148 (1971)). *See also Jaillet v. Cashman,* 235 N.Y. 511, 139 N.E. 714 (1923) (publisher is not liable to one with whom it has *no contract* or fiduciary relationship for an unintentional mistake in its report).

 S & P has the right and the ability to contract away its First Amendment protection. Courts are reluctant, however, to find a promise to limit First Amendment protection if it is not clearly part of the contract:

> ... *Cohen* does not relieve a drafter [of a contract] of the responsibility of making the contract clear. In *Cohen,* no ambiguity existed in the promise between the interviewee and reporters who assured that the interviewee's name would be confidential.... [U]nless the parties have clearly promised to limit the flow of information as they did in the confidentiality agreement in *Cohen,* an ambiguous contract should be read in a way that allows viewership and encourages debate.

*Wildmon v. Berwick Universal Pictures,* 803 F.Supp. 1167, 1178 (N.D.Miss.1992).

 In *Wildmon,* the district court considered whether a film producer had agreed not to distribute a documentary containing portions of an interview to any media other than a single British television station without the plaintiff's permission. *Id.* at 1169. The County's lawsuit does not involve the same direct limitation on distribution, however the prospect of liability may lead to self-censorship causing a similar negative impact on free expression. As in *Wildmon,* the Court will strictly interpret a contract allegedly undertaking to decrease a publisher's standard of liability for misstatements.

 This does not mean the County must demonstrate specific language reducing S & P's standard for liability. When a publisher voluntarily undertakes a duty to provide accurate information, the duty itself subjects the publisher to less than actual malice protection. As described above, the vague terms of the MOA's may

imply, but do not state, S & P agreed to supply an accurate rating.

S & P contends the lack of such specific agreement requires the Court to interpret the contract in favor of First Amendment protection and find no undertaking of liability for inaccurate statements made without actual malice. As the Court previously concluded, however, there will be evidence both parties intended S & P would not only provide a rating but that the rating would carry some degree of accuracy. Allowing the County to pursue the breach of contract action in light of these implications does not threaten S & P's First Amendment protection because, if proven, it would only hold S & P to obligations it voluntarily assumed.

S & P further contends its ratings are non-actionable opinion which cannot give rise to any liability, contract or tort. In *Milkovich v. Lorain Journal Co.,* the Supreme Court rejected a bright line division between defamation actions based on false statements of fact and those based on statements of opinion. 497 U.S. 1, 18–21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). S & P contends the Ninth Circuit and the California courts disallow liability for false statements of fact which do not imply an assertion of objective fact. *See Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir. 1995). All of the cases cited by S & P involved tort causes of action. *Partington,* 56 F.3d 1147 (defamation); *Unelko Corp. v. Rooney,* 912 F.2d 1049 (9th Cir.1990) (defamation); *Morningstar, Inc. v. Superior Court,* 23 Cal.App.4th 676, 29 Cal. Rptr.2d 547 (1994) (defamation); *Weinstein v. Friedman,* 1996 WL 137313 (S.D.N.Y.1996) (defamation); *Borba v. Thomas,* 70 Cal.App.3d 144, 138 Cal.Rptr. 565 (1977) (fraud). None of these cases dictates breach of contract actions based on inaccurate statements of opinion are barred by the First Amendment.[4]

---

**4.** Similarly, the Court rejects S & P's contention the County must plead the ratings were false to state a claim for breach of contract. The cases S & P cites involve tort rather than contract claims. *Philadelphia Newspapers,* *Inc. v. Hepps,* 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Blatty,* 42 Cal.3d at 1042, 232 Cal.Rptr. 542, 728 P.2d 1177.

The County has adequately pled a breach of contract action not governed by the First Amendment's actual malice standard. The Bankruptcy Court's denial of the motion to dismiss the breach of contract claims at this pleading stage is AFFIRMED.

### 2. Professional Negligence

S & P contends the Bankruptcy Court should have granted the motion to dismiss the County's cause of action for professional negligence. Essentially, S & P contends it owed no tort duty to the County in connection with its ratings.

■ California law emphasizes the distinction between contract and tort damages. In recent decisions, the California Supreme Court has "reiterated the important differences between contract and tort theories of recovery" recognizing "[c]onduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 95, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995), 44 Cal.Rptr.2d 420, 900 P.2d 669, 674 (1995) (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 516, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)).

The County contends it need only allege a contractual duty to establish a tort duty. In support of this argument, the County cites *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 803, 157 Cal.Rptr. 407, 598 P.2d 60, 62 (1979). The California Supreme Court stated in *J'Aire:*

> Liability for negligent conduct may only be imposed where there is a duty of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member. (Citation omitted). A duty of care may arise through statute or by contract.

24 Cal.3d at 803, 157 Cal.Rptr. 407, 598 P.2d at 62. *Applied* and *Freeman & Mills* indicate otherwise, holding an independent tort duty is required for a tort action. The County seeks to limit those cases to the specific torts they involved: Bad faith denial of the existence of a contract and conspiracy to interfere with one's own contract.

Although neither *Applied* nor *Freeman & Mills* addresses whether a negligence cause of action can arise from a strictly contractual duty, the tenor of those opinions requires the Court to find an independent duty of care:

> Our decisions in *Foley, Hunter,* and *Applied Equipment* each contain language that strongly suggests courts should limit tort recovery in contract breach situations to the insurance area, at least in the absence of violation of an independent duty arising from principles of tort law other than denial of the existence of, or liability under, the breached contract.

*Freeman & Mills,* 11 Cal.4th at 95, 44 Cal.Rptr.2d 420, 900 P.2d at 675. The general statement to the contrary in *J'Aire* appears to be superseded by the more recent case law. The Court therefore disagrees with the Bankruptcy Court's determination a contractual duty is sufficient to create a duty in tort.

■ This does not end the inquiry, however. S & P's position in the securities field may have caused it to assume an independent professional duty enforceable in a tort action. The Ninth Circuit recently stated the elements of a professional negligence cause of action:

> In order to establish a claim for professional negligence, a plaintiff must demonstrate: 1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; 2) a breach of that duty; 3) a proximate causal connection between the negligent conduct and the resulting injury; and 4) actual loss or damage resulting from the professional's negligence.

*In re Daisy Sys. Corp.,* 97 F.3d 1171, 1175 (9th Cir.1996) (citing *Jackson v. Johnson,*

5 Cal.App.4th 1350, 1355, 7 Cal.Rptr.2d 482 (1992)).

In *Daisy*, Bear Stearns, an investment bank, was to serve as an exclusive financial advisor to the plaintiff, Daisy, in connection with a proposed transaction. When problems arose and Daisy was forced into bankruptcy, Daisy sued Bear Stearns for professional negligence. *Id.* at 1173.

Bear Stearns sought summary judgment asserting its duties were limited to the terms in engagement letters similar to those in the MOA's. Bear Stearns was to give advice on valuation and structuring of the transaction, but would receive all information from Daisy and would not undertake to verify the information. Bear Stearns asserted the engagement letters limited their liability and precluded the professional negligence claim. *Id.* at 1174.

The Ninth Circuit disagreed, finding that Bear Stearns overstated the reach of the engagement letters, and that the engagement letters did not limit Bear Stearns' duties to giving advice on the valuation and structure of the transaction. Daisy had presented expert testimony establishing the duty of care in the investment banking community which was not inconsistent with the express terms of any written agreement between Daisy and Bear Stearns. The Ninth Circuit accepted Daisy's view of the professional duty. *Id.* at 1176.

S & P notes several factual differences between *Daisy* and the County's lawsuit. S & P is not an investment banker, was not the County's exclusive financial advisor, did not have a fiduciary relationship with the County, and received more modest fees than Bear Stearns received. However, the Ninth Circuit did not base its duty determination on any of these factors. The County alleges S & P was hired as a professional, represented itself as an expert in all aspects of municipal finance, is a registered investment adviser under the Investment Adviser Act of 1940 and that S & P failed to exercise its duties with the requisite standard of care. Compl. ¶ 87. *Daisy* indicates the existence and contours of the standard of care should be determined through expert testimony rendering a motion to dismiss on the duty issue inappropriate.

Separating S & P's tort and contractual duties requires the Court to consider again the First Amendment issue. The prior determination the First Amendment does not bar a breach of contract action does not apply to tort actions. Breach of contract actions may be enforced without offending the First Amendment because the publisher voluntarily undertakes an obligation by entering into the contract. Tort actions, however, necessarily seek to enforce a duty the publisher did not assume through the contract:

> [Whereas] [c]ontract actions are created to protect the interest in having promises performed, [t]ort actions are created to protect the interest in freedom from various kinds of harm. The duties imposed which give rise to them are imposed by law and are based primarily on social policy, and not necessarily based upon the will or intention of the parties. . . .

*Applied,* 7 Cal.4th at 515, 28 Cal.Rptr.2d 475, 869 P.2d at 460.

 In the professional negligence action, the County alleges tort damages caused by inaccurate ratings. The issue is whether S & P's First Amendment privilege requires the County to allege actual malice to state a tort claim arising from the allegedly inaccurate ratings.[5]

---

**5.** Although the Bankruptcy Court did not reach the independent duty issue, it stated it could not imagine a factual scenario where the County would lose its breach of contract cause of action and recover on its tort cause of action. Practically this may or may not be the case. However, this Court's determination that the County's tort causes of action must arise out of some non-contractual duty imposed on S & P requires consideration of the First Amendment issues in both the contract and tort contexts.

This appears to be an issue of first impression.[6] The professional liability cases cited by the County and S & P do not involve professional publishers protected by the actual malice standard. Moreover, there are few cases analyzing claims for non-reputational or state-of-mind tort damages caused by publishers' negligent misstatements. *Blatty* presents the most similar factual scenario. In *Blatty,* an author sought to recover damages from the New York Times for their alleged failure to include his book on its best-seller list. *Blatty,* 42 Cal.3d at 1045, 232 Cal.Rptr. 542, 728 P.2d 1177. Blatty asserted several causes of action including intentional interference with prospective economic advantage against the New York Times. The California Supreme Court stated the First Amendment limitations established in the defamation context (including the actual malice standard) apply to all claims whose gravamen is the alleged injurious falsehood of a statement. *Id.* at 1042, 232 Cal.Rptr. 542, 728 P.2d 1177.

*Blatty* did not consider the situation alleged in this case. The County contends S & P held itself out as a professional and thereby assumed certain duties not otherwise applicable. California law has recognized differences in the application of tort law for "actionable misrepresentations" when a "party holds himself out to be specially qualified and the other party is so situated that he may reasonably rely upon the former's superior knowledge." *In re Jogert, Inc.,* 950 F.2d 1498, 1507 (9th Cir. 1991) (citing *Borba v. Thomas,* 70 Cal. App.3d 144, 152, 138 Cal.Rptr. 565 (1977)) (considering whether a party could bring a fraud cause of action based on a prediction of future events).[7] This is the relationship

the County alleges it had with S & P.[8] Such a relationship was not alleged in *Blatty.* The relationship between S & P and the County is a critical distinguishing factor between this case and *Blatty.*

Although there is no authority considering the interaction between professional negligence and the First Amendment's protection of free expression, certain courts have considered the relationship between a professional negligence claim and the First Amendment's protection of the free exercise of religion.

In *Dausch v. Rykse,* the Seventh Circuit allowed an individual to pursue a claim of professional negligence based on psychotherapy malpractice against her church's pastor. 52 F.3d 1425 (7th Cir.1994) The plaintiff alleged she sought secular psychological counseling from her pastor who held himself out as a trained psychological counselor and undertook, as a function apart from pastoral counseling, to provide such a professional service that did not implicate the beliefs or practices of the church. *Id.* at 1435. As in *Cohen,* the Seventh Circuit reasoned the Free Exercise clause of the First Amendment does not "relieve an individual of the obligation to comply with neutral laws of general applicability." *Id.* Analogizing from laws generally applicable to publishers, the Supreme Court reached a similar conclusion with respect to the Free Exercise clause in *Employment Div. Dept. of Human Res. v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

The County argues its professional negligence cause of action stems from services S & P provided in its capacity as a financial analyst divorced from services it pro-

---

**6.** Other district courts appear to have rejected S & P's opinion arguments with little analysis of the First Amendment implications. *In re Taxable Municipal Bond Sec. Litig.,* 1993 WL 591418 (E.D.La.1993), *First Financial Savings Bank, Inc. v. American Bankers Ins. Co. of Fla., Inc.,* 1989 WL 168015 (E.D.N.C. 1989). This important constitutional issue warrants more attention than was afforded in those cases.

**7.** These cases also defeat S & P's contention its ratings are opinions immunized from tort liability.

**8.** Although S & P's contract with the County does not itself create a duty in tort, it may establish the County's right to rely on S & P's analysis of the bond offerings.

vides in its protected publishing function. In essence, the County asserts injuries arising from the ratings it received from S & P without reference to S & P's decision to publish them. As described above, the complaint fails to distinguish between S & P's activities as an advisor to the County and its constitutionally protected expression: Both are embodied in the ratings S & P prepared and provided. Unless the County alleges facts separating the two activities, the Free Exercise cases suggest S & P is constitutionally protected from the County's claim for professional negligence unless there was actual malice.

The County may have facts to allege either the separation between S & P's conduct as the County's financial advisor and its expression as a financial publisher, or S & P provided the ratings with actual malice. At present, it has not done so.

The Bankruptcy Court's denial of the motion to dismiss the professional negligence claim will be REVERSED, and the professional negligence cause of action will be DISMISSED with 20 days leave to amend.

### III. DISPOSITION

The Bankruptcy Court's denial of S & P's motion to dismiss the claim for breach of contract is AFFIRMED. The denial of the motion to dismiss the professional negligence cause of action is REVERSED and that cause of action is DISMISSED with 20 days leave to amend.