**In re FITCH, INC., Appellant–Cross–Appellee,**

**American Savings Bank, FSB, Plaintiff–Appellee–Cross–Appellant,**

v.

**UBS PaineWebber, Inc., Defendant.**

**Docket Nos. 03–7062, 03–7076.**

United States Court of Appeals, Second Circuit.

Argued: April 4, 2003.

Decided: May 21, 2003.

---

Evan A. Davis, Cleary, Gottlieb, Steen & Hamilton, New York, N.Y. (Anil Kalhan, of counsel, on the brief) for Appellant–Cross–Appellee Fitch, Inc.

Adrienne B. Koch, Esanu Katsky Korins & Siger, LLP, New York, N.Y. (Paul Alston, Alston Hunt Floyd & Ing, Honolulu, HI, on the brief), for Plaintiff–Appellee–Cross–Appellant American Savings Bank, FSB.

(Floyd Abrams, Adam Zurofsky, and Brian Markley, Cahill Gordon & Reindel, New York, NY, submitted a brief for Amicus Curiae Standard & Poor's in support of Appellant Fitch, Inc.)

(Mark A. Fowler and James J. Coster, Satterlee Stephens Burke & Burke LLP, New York, NY, submitted a brief for Amicus Curiae Moody's Investors Service, Inc., in support of Appellant Fitch, Inc.)

(Eliot Spitzer, Attorney General of the State of New York, by Michelle Aronowitz and Andrea Oser, Albany NY, submitted a brief for Amicus Curiae State of New York in support of Appellee American Savings Bank, FSB.)

Before: WALKER, Chief Judge, OAKES and KATZMANN, Circuit Judges.

PER CURIAM.

This appeal presents a question about the outer boundaries of the statutory protection against non-party subpoenas in a civil case that New York has created for professional journalists, and the extent to which information-gathering organizations that are not traditionally considered part of the media may claim that privilege. Appellant Fitch, Inc., a financial rating agency, appeals from an order of the United States District Court for the Southern District of New York (Keenan, *J.*) finding

Fitch in contempt for its refusal to comply with a subpoena issued by that Court in connection with underlying litigation in the District of Hawaii. In granting the motion to enforce the subpoena, the district court held that Fitch could not assert the news-gathering privilege that is codified in New York's Shield Law. *See* N.Y. Civ. Rights Law § 79–h (McKinney 2002). For the reasons that follow, we affirm the judgment of the district court.

## BACKGROUND

Fitch is a New York-based company in the business of analyzing and rating securities and debt offerings. When one of Fitch's clients—for example, a corporation or bank—is planning to issue a security, it contracts with Fitch to rate that security. The issuing company pays Fitch a fee; in exchange, Fitch will research, analyze, and provide a rating of the proposed transaction. The rating reflects Fitch's expert opinion of the underlying financial strength of the security. This rating may take into consideration various factors, but usually will consider such issues as the likelihood of default or the expected rate of return. The ratings themselves are based on the aggregate of all the relevant factors, and are expressed in the form of letters or combinations of letters that indicate the relative safety or risk of the security, with "+" and "-" signs also employed to signify shades of risk within a given rating score. For example, an "investment grade" bond issue that offered the lowest level of risk might be rated "AAA" by Fitch, and a "non-investment grade" bond that carried a higher risk of default might be rated "BB" or "BB+." Fitch communicates its rating to the client, but also makes rating information available to the general public for free for a limited time on its web site. When the short period of time that the ratings reports are publically available expires, the ratings are transferred to an archive, where they may be retrieved by customers that pay a subscription fee for the privilege.

Clients have their securities rated for two reasons. First, once the security or debt has received a favorable rating, that rating makes it easier to sell the security to investors, who rely upon Fitch's analysis and evaluation. The second reason is that a favorable rating carries with it a regulatory benefit as well. Fitch, along with its direct competitors Amici Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's ("S & P"), has been designated by the Securities and Exchange Commission ("SEC") as a "nationally recognized statistical rating organization" ("NRSRO") whose endorsement of a given security has regulatory significance, as many regulated institutional investors are limited in what types of securities they may invest based on the securities' NRSRO ratings. *See* Sec. And Exch. Comm'n, Report On The Role And Function Of Credit Rating Agencies In The Operation Of The Securities Markets 5–8 (Jan.2003), *available at* http://www.sec.gov/news/studies/credratingreport0103.pdf (last visited May 20, 2003).

Plaintiff–Appellee American Savings Bank, FSB ("ASB") is a federally-chartered savings bank based in Hawaii. As a savings bank, ASB is regulated by the Office of Thrift Supervision ("OTS"). Regulations forbid savings banks like ASB from buying and holding securities that are not liquid and are not considered investment grade. *See* 12 C.F.R. § 560.40 (2002). Defendant UBS PaineWebber, Inc. ("PaineWebber") is one of ASB's long-time brokers. In 1999, PaineWebber created securities specifically tailored for ASB. These securities were supposed to

satisfy the OTS regulations that govern ASB's investments.

The securities at issue were so-called "principal protected" securities that were based on equity in a "Collateralized Loan Obligation" ("CLO"). A CLO is created by aggregating large numbers of commercial debt obligations, dividing the rights to the repayment stream into many subdivisions, and selling those subdivisions as tradable securities. PaineWebber combined the rights in the CLO with other investment interests with the goal of yielding a security that was "investment grade" as to risk and that guaranteed the return of principal at a future date. The goal was to create a specialized security that would enable ASB to reap the higher rate of return associated with equity investments, while satisfying the regulatory requirement that it not actually own equity (with its attendant risk to principal).

This financial scheme would be accomplished by directing ASB's investment capital into a trust, which would then issue "Trust Certificates" to ASB. The trust would then "swap" the money for the CLO equity, in an arrangement that provided that the counter-party to the swap would pay ASB an amount of money equal to ASB's principal investment, as well as the proceeds from the CLO cash flow; this payment was to be made at a specified time in the future (as if it were a bond maturing).

ASB agreed to the deal, and between 1999 and 2000 it invested approximately $83 million in the Trust Certificates. Not long after the last transaction was consummated, however, OTS told ASB that the transaction was illegal, because the CLOs were not considered "investment grade," as required by regulations, and it ordered ASB to dispose of the investment. ASB attempted to return the Trust Certificates to PaineWebber, which refused to accept

them. ASB then sued PaineWebber in the United States District Court for the District of Hawaii, seeking recission of the investment agreements and damages for negligence and breach of warranty.

PaineWebber had NRSROs perform ratings at two points during the transactions. First, Moody's issued a private letter rating of the swap agreements based on the financial strength of the counter-parties and the likelihood that ASB would get its principal back. Second, the underlying CLOs were fully rated by both Fitch and Moody's.

During discovery in the underlying suit, ASB unearthed facts that led it to believe that PaineWebber and Fitch had extensive communications about the structure of the transactions that created the Trust Certificates (which Fitch did not, in the end, rate). These communications concerned what PaineWebber needed to do to earn an "investment grade" rating from Fitch. Specifically, ASB alleges that PaineWebber and Fitch communicated about (1) whether Fitch would rate the Trust Certificates; (2) whether this type of security could ever be rated investment grade; (3) the methodology of the modeling used to perform the ratings; and (4) what changes to the deal's structure would be required to achieve the desired rating.

According to ASB, PaineWebber claims to have relied on information it received from Fitch in making certain marketing representations to ASB as to the risk level and anticipated rate of return of the investment. Because discovery materials produced by PaineWebber to ASB are incomplete, ASB subpoenaed Moody's and Fitch seeking information about their dealings with PaineWebber in regard to the investment by ASB. The subpoenas were served on August 26, 2002, in the Southern District of New York.

Fitch refused to produce any documents or submit to any depositions, claiming the protection of the New York Press Shield Law. After negotiations failed,[1] ASB moved to enforce the subpoenas, and Fitch counter-moved to quash the subpoenas. The district court issued an Opinion and Order dated December 16, 2002, resolving the issue in ASB's favor. When Fitch refused to comply with the subpoena, the district court held Fitch in contempt in an Order and Judgment dated January 16, 2003. This appeal followed.

### STANDARD OF REVIEW

Motions to compel and motions to quash a subpoena are both "entrusted to the sound discretion of the district court." *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir.2000). This principle is in keeping with the traditional rule that " '[a] trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion.' " *In re DG Acquisition Corp.*, 151 F.3d 75, 79 (2d Cir.1998) (quoting *Cruden v. Bank of N. Y.*, 957 F.2d 961, 972 (2d Cir.1992)) (alteration in original). "A district court abuses its discretion when '(1) its decision rests on an error of law ... or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.' " *Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 498 (2d Cir.2002) (quoting *Zervos v. Verizon, N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001)) (alteration in original).

### DISCUSSION

In some cases, a professional journalist or newsgatherer can resist a third-party subpoena that seeks information related to the journalist's professional activity. As the New York Court of Appeals has explained:

> The ability of the press freely to collect and edit news, unhampered by repeated demands for its resource materials, requires more protection than that afforded by the disclosure statute. The autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted. Moreover, because journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation, attempts to obtain evidence by subjecting the press to discovery as a nonparty would be widespread if not restricted on a routine basis. The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press.

*O'Neill v. Oakgrove Const., Inc.*, 71 N.Y.2d 521, 526–27, 528 N.Y.S.2d 1, 523 N.E.2d 277 (1988) (citations omitted). In response to this concern about protecting the press from the burdens of nonparty discovery, both federal and New York courts recognize a special privilege that can be asserted by journalists resisting a subpoena. New York codified its journalistic privilege into the Shield Law, N.Y. Civ. Rights Law § 79–h (McKinney 2002). The Shield Law protects journalists from contempt for refusing to comply with a nonparty subpoena

---

1. ASB also subpoenaed Moody's, and Moody's initially also resisted on the grounds of the Shield Law. After a motion to enforce was filed, but before Moody's reply was due, the two sides reached a settlement.

when the subpoena seeks to discover information conveyed to the journalist in confidence. *Id.* § 79–h(b). It also prevents discovery of unpublished nonconfidential information unless the party seeking the subpoena makes a "clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." *Id.* § 79–h(c). There is also a "common law" privilege recognized by this Court independent of New York's Shield Law. *See Gonzales v. Nat'l Broad. Co., Inc.,* 194 F.3d 29, 32 (2d Cir.1999) (endorsing journalistic privilege for nonconfidential information); *In re Petroleum Prods. Antitrust Litig.,* 680 F.2d 5, 7 (2d Cir.1982) (per curiam) (recognizing privilege for confidential information). Because both parties agree that the New York rule is more journalist-protective, and that New York law applies in this case, *compare* Brief for Appellant–Cross–Appellee Fitch, at 13 & n. 3, *with* Brief for Plaintiff–Appellee–Cross–Appellant ASB, at 26 & n. 14, the subtle differences between the federal and state rules are not material.

The Shield Law defines "professional journalist" as

"one who, for gain or livelihood, is engaged in gathering, preparing, collecting, writing, editing, filming, taping or photographing of news intended for a newspaper, magazine, news agency, ... or other professional medium or agency which has as one of its regular functions the processing and researching of news intended for dissemination to the public."

N.Y. Civ. Rights Law § 79–h(a)(6). It defines "[n]ews" as "written, oral, ... or electronically recorded information or communication concerning ... events or other matters of public concern or public interest or affecting the public welfare." *Id.* § 79–h(a)(8).

Fitch argues that it conducts research, fact-gathering, and analytical activity that is directed towards matters of general public concern, just like any journalist, and notes that it makes its information available on its web site to the general public. In support of this argument, Fitch points to two district court cases that found S & P, a competitor of Fitch with similar business activity, to be a journalist for the purpose of asserting the privilege. *See In re Pan Am Corp.,* 161 B.R. 577, 580–82 (S.D.N.Y.1993); *In re Scott Paper Co. Sec. Litig.,* 145 F.R.D. 366, 369–70 (E.D.Pa. 1992). Although we agree that the analysis contained in these decisions is compelling, we believe that subtle differences in the facts of this case mandate a different outcome.

First, we find the nature of Fitch's asserted newsgathering relevant. ASB argues that Fitch only "reports on" specific transactions for which it has been hired. Unlike a business newspaper or magazine, which would cover any transactions deemed newsworthy, Fitch only "covers" its own clients. We believe this practice weighs against treating Fitch like a journalist. We note that the district court in *Pan Am* based its holding that S & P was a journalist in part upon the fact that S & P rated virtually all public debt financing and preferred stock issues whether they were done by S & P clients or not. *See Pan Am,* 161 B.R. at 583; *see also LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1095–96 (S.D.N.Y. 1996) (declining to permit Duff & Phelps to assert privilege because it was hired to rate transaction at issue privately).

We have not found much evidence in the record to support Fitch's claim that it regularly analyzes or publishes a rating for a

transaction it is not paid to rate. The only real information in the record about this question is the testimony of Kevin Duignan, managing director of Fitch's Asset–Backed Securities group, given as part of a hearing in a state court proceeding. He acknowledged that the vast majority of Fitch's rating activities are initiated by client request. He testified that the occasional "Fitch–Initiated Rating" is usually a follow-up to a security that Fitch has previously rated, or a transaction Fitch and a client discussed rating but failed to agree. Duignan testified as follows:

> "It is not our [Fitch's] regular practice to rate transactions . . . that we are not paid by the underlying issuer initially. There are transactions that we have commenced on that we have not been paid to rate."

> \*   \*  ·  \*    \*    \*    \*

> Q: So is it a fair statement then that the underlying transactions you are rating without a fee are still part of a larger transaction for which Fitch is getting paid a fee by somebody?
>
> A: Yes.
>
> Q: Any other instances that you're aware of where Fitch rates a transaction without being paid a fee by somebody?
>
> A: On a transaction level basis, I can't recall any.

Koch Reply Aff. at Ex. L (Duignan Dep. at 49:13–17, 51:3–11)

This practice, of course, contrasts noticeably with Standard & Poor's practice (as described in *Pan Am*) of rating nearly all public debt issuances regardless of whether it was hired to do so or not. *See Pan Am*, 161 B.R. at 583. We do not suggest that an ostensible newsgathering organization is required to cover all events in order to qualify as journalists—part of a journalist's job is exercising judgment about which events are newsworthy and which

are not. We believe, however, that Fitch's information-disseminating activity does not seem to be based on a judgment about newsworthiness, but rather on client needs. We believe this weighs against Fitch being able to assert the privilege for the information at issue.

ASB further argues that Fitch takes an active role in the planning of the transactions it analyzes, a role that is inconsistent with traditional journalism. Fitch concedes that it exchanges information with the companies it rates, but disputes that it is involved enough to alter its status as a journalist. It is indisputable that Fitch has an extremely close relationship with the companies it rates. Fitch admits that it makes its ratings criteria available to the subjects of its ratings, and that the companies often conform their transactions to those ratings criteria. Fitch denies, however, that any employees of Fitch ever make any suggestions to the companies it rates as to how to structure their offerings.

After reviewing the record, we find that the material filed under seal to be directly relevant to this issue. In light of the protective order in place in this action, we only discuss this evidence in general terms. We conclude that the sealed material makes it clear that ASB's claim that Fitch plays an active role in structuring the transaction is extremely credible. ASB submitted under seal electronic mail correspondence that indicates fairly strongly that Fitch played an active role in helping PaineWebber decide how to structure the transaction. The sealed portion of the record consists of the Declaration of Paul Alston (ASB's lawyer in the Hawaii action) and attachments. The attachments reflect a series of electronic mail and fax communications between a Fitch employee and two of PaineWebber's employees. This correspondence indicates a fairly ac-

tive role on the part of the Fitch employee in commenting on proposed transactions and offering suggestions about how to model the transactions to reach the desired ratings. *See, e.g.*, Alston Decl., Ex. 1 (Fitch employee providing modeling assumptions that indicate what statistics are necessary to achieve various ratings); *id.* Ex. 4 (Fitch employee suggesting changes in the deal structure). We are not suggesting that any of these communications are improper, of course. However, we believe that they reveal a level of involvement with the client's transactions that is not typical of the relationship between a journalist and the activities upon which the journalist reports. Accordingly, we believe that this evidence also counsels strongly against finding that Fitch may assert the privilege for this information.

Taking these two factors together, we conclude that the district court did not abuse its discretion in finding that Fitch was not entitled to assert the journalist's privilege for the information at issue. For the sake of clarity, we note that we are not deciding the general status of a credit rating agency like Fitch under New York's Shield Law: Whether Fitch, or one of its rivals, could *ever* be entitled to assert the newsgathering privilege is a question we leave for another day. Nor do we seek to amplify or interpret New York law beyond the facts of this case. We simply conclude that on these facts, the district court did not abuse its discretion by concluding that Fitch had not sufficiently shown that the information it sought to protect was gathered pursuant to the newsgathering activities of a professional journalist.

Because we decide here that Fitch may not assert the privilege, we do not reach Fitch's claim that the district court's conclusion that ASB had, in any event, overcome the privilege should be reversed for the absence of statutorily-mandated "clear

and specific findings made after a hearing." N.Y. Civ. Rights Law § 79–h(c). We also need not decide if Fitch has waived its privilege claim by disclosing some of the contested information to the OTS, or by failing to produce a privilege log in accordance with Fed. R. Civ. P. 45(d)(2) and S.D.N.Y. Local Civ. R. 26.2(a)(2).

We have considered all of appellant's arguments. For the foregoing reasons, the order of the district court is affirmed. The mandate shall issue forthwith.