# Mandatory Registration of Credit Rating Agencies

The Administration's proposal for mandatory registration of credit rating agencies—which would exempt an agency if (1) it does not provide ratings of securities in exchange for fees or other forms of compensation from the securities' issuers; and (2) it issues credit ratings only in any bona fide newspaper, news magazine or business or financial publication of general and regular circulation—would comply with the First Amendment.

October 22, 2009

LETTER OPINION FOR THE
ASSISTANT SECRETARY FOR FINANCIAL INSTITUTIONS
DEPARTMENT OF THE TREASURY

You have asked us to assess whether the Administration's proposal for mandatory registration of credit rating agencies, which would include an exemption designed to address First Amendment concerns, would be constitutional. For the reasons given below, we conclude that the Administration's registration proposal would satisfy the First Amendment's requirements.[1]

Under existing law, a credit rating agency may "*elect[]* to be treated as a nationally recognized statistical rating organization" by furnishing an application demonstrating that it meets certain criteria. 15 U.S.C. § 78*o*-7(a)(1)(A) (emphasis added). A registered credit rating agency receives certain benefits by being a "nationally recognized rating organization" and must abide by certain statutory requirements. *See id.* § 78*o*-7. As we understand it, the Administration wishes to amend the law to make

---

[1] Our conclusion assumes that application of the particular requirements and limitations that would be required of registered agencies would be tailored in accord with First Amendment requirements so that there would be no unconstitutional constraints imposed on the speech of registered agencies. We have not had sufficient time to consider the various particular regulatory requirements, either under the existing statute or in the Administration's proposal, and we express no view on whether any particular requirement would be constitutionally permissible as applied to the publication or conveyance of particular credit ratings. It is our understanding that, under the Administration's proposal, those requirements and limitations would only take effect once the Securities and Exchange Commission issues regulations implementing the new statute—regulations that that would have to reflect any exemptions or limitations the First Amendment may require.

it mandatory for credit rating agencies to register as nationally recognized statistical rating organizations—to the extent consistent with the Constitution. The current definition of "credit rating agency" is any person

> (A) engaged in the business of issuing credit ratings on the Internet or through another readily accessible means, for free or for a reasonable fee, but does not include a commercial credit reporting company;

> (B) employing either a quantitative or qualitative model, or both, to determine credit ratings; and

> (C) receiving fees from either issuers, investors, or other market participants, or a combination thereof.

*Id.* § 78c(a)(61).

A requirement that all "credit rating agen[cies]" so defined register with the federal government would implicate the First Amendment because such a requirement may impose at least some burden on their speech activities—namely, "issuing credit ratings on the Internet or through another readily accessible means, for free or for a reasonable fee." "As a matter of principle," the Supreme Court has explained, "a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly." *Thomas v. Collins*, 323 U.S. 516, 539 (1945); *see also id.* at 540 ("If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order.").

In light of these First Amendment concerns, analogous registration requirements in other financial regulatory statutes include exemptions designed to avoid constitutional problems. The Investment Advisers Act, for example, contains an exemption from its registration requirement for "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." 15 U.S.C. § 80b-2(a)(11). And the Commodity Futures Trading Commission has adopted by regulation an exemption from the registration requirement of the

Commodity Exchange Act for any person that "does not engage in . . . [d]irecting client accounts; or . . . [p]roviding commodity trading advice based on, or tailored to, the commodity interest or cash market positions or other circumstances or characteristics of particular clients; or . . . [i]f, as provided for in section 4m(1) of the Act, during the course of the preceding 12 months, it has not furnished commodity trading advice to more than 15 persons and it does not hold itself out generally to the public as a commodity trading advisor." 17 C.F.R. § 4.14(a)(9), (10).

The Administration's proposal mirrors these other financial regulatory statutes. The proposal would exempt from the registration requirement any credit rating agency that satisfies two criteria: (i) it does not provide ratings of securities in exchange for fees or other forms of compensation from the securities' issuers; and (ii) it issues credit ratings only in any bona fide newspaper, news magazine or business or financial publication of general and regular circulation.[2]

Although the precise line for First Amendment purposes is not absolutely clear in this area, we believe that a mandatory registration requirement for credit rating agencies that contained such an exemption would comply with the First Amendment. We begin with the prong of the exemption that would require credit rating agencies to issue credit ratings only in any bona fide newspaper, news magazine or business or financial publication of general and regular circulation. This prong of the exemption derives from the Supreme Court's treatment of the similar Investment Advisers Act exemption in *Lowe v. Securities and Exchange Commission*, 472 U.S. 181 (1985).

In that case, the Securities and Exchange Commission had sought to enjoin Lowe from publishing an investment advice newsletter because it had previously revoked his registration as an investment adviser under the Act, due to his conviction for a series of financial crimes. Particularly in light of the "important constitutional question" raised by such a bar on publication, the Court read the Act's exemption for the "publisher of any bona fide newspaper, news magazine or business or financial publication

---

[2] The second criterion is adapted from the current Investment Advisers Act, which, as we explain below, the Supreme Court has construed so as to avoid First Amendment concerns. We assume the criterion in the proposed exemption would be given a similar construction.

of general and regular circulation" broadly to shield Lowe's newsletter, which reached an audience of between 3,000 and 19,000 subscribers. *Id.* at 188, 185. The Court further held that although Lowe's publication of his securities newsletters had not been "regular" in the sense of consistent circulation—in that the newsletters had not been published on a regular semimonthly basis as advertised—they were nevertheless "regular" for purposes of the Investment Advisers Act because there was "no indication that they have been timed to specific market activity, or to events affecting or having the ability to affect the securities industry." *Id.* at 209. The Court explained that its reading of the Act was informed by "the apparent intent of Congress to keep the Act free of constitutional infirmities." *Id*. at 207. The majority contrasted the character of Lowe's newsletter publishing, which it implied was entitled to strong First Amendment protection, with professional services involving speech that may be subjected to regulation without offending the First Amendment, such as the provision of legal advice by lawyers to their clients. The former, the Court emphasized, involved "communications [with] subscribers [that] remain entirely impersonal and," unlike the latter, "do not develop into the kind of fiduciary, person-to-person relationships that were discussed at length in the legislative history of the Act and that are characteristic of investment adviser-client relationships." *Id*. at 210; *see also id*. at 210 n.57 (noting that it was "significant" that Lowe did not engage in "individualized, investment-related interactions" with his subscribers).

In a separate opinion in *Lowe* by Justice White, three Justices found that the Act's statutory "publisher" exemption could not be construed to apply to Lowe's irregular publication, and therefore addressed the First Amendment question directly. They observed that the "power of government to regulate the professions is not lost whenever the practice of a profession entails speech," *id.* at 228, "[b]ut the principle that the government may restrict entry into professions and vocations through licensing schemes has never been extended to encompass the licensing of speech *per se* or of the press. . . . At some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment." *Id.* at 229–30. In attempting to "locate the point where regulation of a profession leaves off and prohibitions on speech begin," Justice White wrote,

[o]ne who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client *in the light of the client's individual needs and circumstances* is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny. *Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted*, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

*Id.* at 232 (emphasis added); *see also Thomas*, 323 U.S. at 544–45 (Jackson, J., concurring) ("Though the one may shade into the other, a rough distinction always exists, I think, which is more shortly illustrated than explained. A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.").

In accord with the majority and concurring opinions in *Lowe* regarding the line between impermissible regulations on speech and "merely permissible regulation of a profession," we think the First Amendment concerns that a mandatory registration requirement may raise are addressed by an exemption for agencies that supply ratings tailored to meet the needs of individual clients. The Court has adopted a somewhat similar line in determining whether credit reports constitute matters of public concern warranting heightened protection in defamation actions. *See*

*Dun & Bradstreet v. Greenmoss*, 472 U.S. 749, 761–63 (1985) (plurality opinion) (concluding that a credit report issued confidentially to five subscribers did not constitute speech about a matter of public concern requiring a plaintiff to show "actual malice" in a defamation suit).[3] The distinction between the provision of advice tailored to meet the needs of individual clients, on the one hand, and publication of opinions to a wide audience, on the other, supports the second prong of the Administration's proposed exemption, i.e., that credit rating agencies would be exempt from registration only if they "issue credit ratings only in any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." If a credit rating agency provides ratings to select investor clients, tailoring the speech it undertakes to those clients' needs, it is engaged in the sort of speech akin to that of other professionals when

---

[3] In accord with *Dun & Bradstreet*, lower courts considering credit rating agencies' First Amendment defenses to claims for defamation, fraud, and various other business torts (as well as breach of contract in at least one instance) have looked in part to whether the reports were distributed to a public audience or tailored to a discrete group of clients. *See, e.g., Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 525–34 (6th Cir. 2007) (affirming grant of summary judgment in favor of credit rating agency defendant on defamation and breach of contract claims based on "actual malice" requirement where ratings were made available to the public); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08-Civ-7508 (SAS), 2009 WL 2828018, *9 (S.D.N.Y. Sept. 2, 2009) (rejecting First Amendment defense to various common law tort claims, including fraud, in part because "plaintiffs have plainly alleged that the . . . ratings were never widely disseminated, but were provided instead in connection with a private placement to a select group of investors"); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 640 (S.D. Ohio 2008) (rejecting First Amendment defense to securities fraud and various common law claims in part because ratings disseminated to a "select class of investors"); *In re Enron Corp.*, 511 F. Supp. 2d 742, 820 (S.D. Tex. 2005) (finding that the First Amendment shielded credit rating agency from negligent misrepresentation claim where the "credit rating reports regarding Enron by national credit rating agencies were not private or confidential, but distributed 'to the world' and were related to the creditworthiness of a powerful public corporation that operated internationally"). At least one court of appeals has invoked the same consideration as one of its reasons for ruling that a credit rating agency could not avail itself of a *statutory* state-law journalist's privilege to refuse to comply with a subpoena. *In re Fitch, Inc.*, 330 F.3d 104, 109 (2d Cir. 2003) ("Unlike a business newspaper or magazine, which would cover any transactions deemed newsworthy, Fitch only 'covers' its own clients."); *see also id.* at 110 ("Fitch's information-disseminating activity does not seem to be based on a judgment about newsworthiness, but rather on client needs. We believe this weighs against Fitch being able to assert the privilege for the information at issue.").

they advise their clients—speech that is constitutionally distinct from the publication of facts or opinions to the public at large. *See Taucher v. Born*, 53 F. Supp. 2d 464 (D.D.C. 1999) (Commodity Exchange Act requirement that commodity trading advisors register with Commodity Futures Trading Commission was unconstitutional as applied to publishers of general commodity trading information strategy and advice, and trading systems, who made general buy and sell recommendations not tailored to any specific individuals, and never had contact with individual investors).

Indeed, federal courts have repeatedly rejected First Amendment challenges to professional licensing statutes as applied to persons who provide services to particular clients, and do not simply offer published advice or information to the general public. *See, e.g.*, *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1053–55 (9th Cir. 2000) (psychologists/psychoanalysts); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (lawyers); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 603–05 (4th Cir. 1988) (accountants); *Fidelity Nat'l Info. Solutions, Inc. v. Sinclair*, No. Civ. A. 02-6928, 2004 WL 764834 (E.D. Pa. Mar. 31) (real estate appraisers); *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (plurality opinion) (rejecting doctors' argument that they had a First Amendment right not to provide information to their patients about the risks of abortion, and childbirth, in a manner mandated by state statute; "[t]o be sure, the physician's First Amendment rights not to speak are implicated, . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State"). These precedents provide support for the application of the registration requirement to credit rating agencies that do not limit their issuance of credit ratings only to any bona fide newspaper, news magazine or business or financial publication of general and regular circulation.

The same reasons that support the constitutionality of mandatory registration for credit ratings agencies that do not satisfy the general publication criterion described above also support application of that registration requirement to any credit rating agency that receives fees or other forms of compensation from *issuers* of securities in return for its provision of ratings. Just as a credit ratings agency may be required to register, in accord with the distinction set forth in *Lowe*, if it provides individualized

advice to client *investors*, so too can registration be required if the agency provides its ratings (even to a public audience) as a professional service on behalf of individual *issuers* of securities. When a credit rating agency is hired by a particular issuer to rate a particular security, it is providing a particular client with a valuable professional service tailored to that client's needs, one for which the issuer-client is willing to pay, presumably because it believes the agency will "exercise judgment on behalf of the client," *Lowe*, 472 U.S. at 232 (White, J., concurring), in order to advance the issuer's own commercial goals. *Cf. Commercial Fin. Servs., Inc. v. Arthur Andersen LLP*, 94 P.3d 106, 110 (Okla. Civ. App. 2004) (rating agencies sued by issuer that hired it not protected by First Amendment against liability for negligent misrepresentation because "[w]hile the Rating Agencies gave 'opinions,' they did so as professionals being paid to provide their opinions to a client").[4]

This conclusion is bolstered by our understanding, based on information provided by officials at the Treasury Department, that a payment by an issuer to a credit rating agency in exchange for issuance of a rating ordinarily entails receipt of the rating by the issuer in advance of public disclosure, and the opportunity for discussion and exchange between the issuer and agency during the development of the rating. In this respect, this criterion of the proposed exemption would appear to be similar to an element of the exemption under the Commodity Exchange Act for "commodity trading advice based on, or tailored to, the commodity interest or cash market positions or other circumstances or characteristics of particular clients." 17 C.F.R. § 4.14(a)(9). To be sure, in developing the rating for the client, the credit rating agency may provide a neutral and candid assessment, using professional methods. But the same is true of accountants and other professionals when they give their clients advice, and yet

---

[4] We recognize that at least two lower courts, in determining whether a credit rating agency was entitled to the benefit of a statutory journalist's privilege, have rejected the significance of the fact that the agency had been hired by the issuer. *See In re Pan Am Corp.*, 161 B.R. 577 (S.D.N.Y. 1993); *In re Scott Paper Co.*, 145 F.R.D. 366 (E.D. Pa. 1993). But the lower courts are divided on that issue, even in the context of that analogous statutory question. *See Fitch*, 330 F.3d 104 (discussed *supra* note **Error! Bookmark not defined.**). Moreover, the considerations relevant to the application of the statutory journalist's privilege may differ from those that determine the constitutional permissibility of a registration requirement.

those professionals may be required to register consistent with the First Amendment. Admittedly, even issuer-paid agencies typically convey their ratings to the public. But other professionals who may be required to register also may subsequently convey to a wider audience some of the information the client has retained them to provide. It is the fact of the individualized provision of a service to a client that supports the registration requirement in either case. Although widespread publication of their ratings may be more central to the service provided by credit rating agencies than is the less frequent public speech by members of regulated professions acting on behalf of their clients (such as when a lawyer publicly discloses an advice of counsel letter), this appears to us to be a difference of degree rather than of kind. *Cf. Lowe*, 472 U.S. at 231 (White, J., concurring) ("the distinguishing factor was whether the speech in any particular case was 'associat[ed] . . . with some other factor which the state may regulate so as to bring the whole within official control'" (quoting *Thomas*, 323 U.S. at 547)). In light of the context-specific analysis courts have followed in assessing First Amendment protections in such cases, we believe findings reflecting the realities of how credit rating agencies operate in providing ratings, such as those that would support the representations made to us by the Treasury Department, would bolster the legal basis for a mandatory registration requirement.

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*